UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

- against -

MUSTAFA OZSUSAMLAR and
OSMAN OZSUSAMLAR,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4 18 06

**OPINION AND ORDER**

S1 05 Cr. 1077 (PKL)

## LEISURE, District Judge:

A Grand Jury indicted the defendants in this case, Osman Ozsusamlar ("Osman") and

Mustafa Ozsusamlar ("Mustafa"), on October 17, 2005. On January 4, 2006, the Grand Jury

returned a Superseding Indictment, charging both defendants with three counts each: one count

of conspiracy to commit a murder for hire in violation of Title 18, United States Code, section

1958(b); one count of murder for hire in violation of Title 18, United States Code, sections 2 and

1958; and one count of conspiracy to commit extortion in violation of Title 18, United States

Code, section 1951. The Government previously moved *in limine* for a ruling allowing it to

introduce, in its case-in-chief, evidence that Mustafa was involved in a previous extortion that

included threats of violence. The Government submitted that the evidence was admissible

pursuant to Federal Rule of Evidence 404(b) to prove intent, knowledge, and absence of mistake

or accident. That motion was denied on the ground that it was premature as Mustafa had not yet

placed his intent at issue. The Government has now renewed its motion on the ground that

Mustafa has not adequately removed the issue of intent from this trial. For the reasons set forth

below, the Government's motion is GRANTED.

## BACKGROUND

The defendants are father and son: Mustafa is the father and Osman is the son.
According to the Government, the victims of the murder-for-hire scheme were a husband and
wife who owed approximately $283,000 to the two defendants. (Gov't Letter Supp. Mot. 2, Mar.
23, 2006 ("Gov't Letter").) Mustafa, while incarcerated at the Metropolitan Correctional Center
(the "MCC") pending sentencing following his conviction in a separate case, asked a fellow
prisoner (the "CW") if he knew of someone who could collect the debt, by force if necessary,
and kill the husband and/or wife[1] after the debt was collected, offering to pay the killer ten
percent of the money collected. (Gov't Letter 2.) The CW reported the scheme to the
Government, who, through the CW, supplied Mustafa with the contact information and first
name of an undercover officer posing as a collector/hit man. (Gov't Letter 2.) Mustafa directed
Osman to locate the victims' address and contact the undercover officer. (Gov't Letter 2.)
Osman contacted the undercover officer and arranged a meeting, at which the two discussed the
details of the scheme. (Gov't Letter 3.) Some time later, the undercover officer called Osman to
tell him that he had carried out the scheme and that he had collected the debt. (Gov't Letter 3.)
Osman and the undercover officer made arrangements to meet, and Osman was arrested when he
arrived at the agreed-upon location. (Gov't Letter 3.)

The Government seeks to admit evidence, pursuant to Federal Rule of Evidence
804(b)(1), that Mustafa was involved in a previous extortion that included threats of violence.
This evidence will consist of the prior sworn testimony of two witnesses who testified at a 1995
jury trial of Mustafa in the District of New Jersey on one count of conspiracy to take hostages
and one count of hostage taking, in addition to several counts of alien smuggling. (Gov't Letter

---

[1] It is not clear from either the Government's submissions or the Superseding Indictment whether the intended
victim was the husband, the wife, or both.

2

Supp. Renew Mot. 3, Apr. 14, 2006; Gov't Letter 5, 9 n.6.) At the 1995 trial, Nermin Durson and Adnan Dikili testified that in or about July 1994, Mustafa, with the help of Osman, arranged for four aliens, including Durson, to be smuggled into the United States for a fee of approximately $10,000 per alien. (Gov't Letter 5.) They also testified that Mustafa brought Durson to Paterson, New Jersey, and demanded additional money from Dikili, who was Durson's boyfriend and who was living in Turkey at that time, before he would release Durson unharmed. (Gov't Letter 5.) The jury convicted Mustafa on all counts, but the Honorable Dickenson R. Debevoise, U.S. District Judge for the District of New Jersey, entered a judgment of acquittal on the two hostage-taking counts.

## DISCUSSION

I.     Motions *in Limine*

A motion *in limine* allows the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. See Luce v. United States, 469 U.S. 38, 41 n.4 (1984) (noting that, "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials"); Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996); Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group, 937 F. Supp. 276, 283 (S.D.N.Y. 1996). The trial court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. See United States v. Van Putten, No. 04 Cr. 803, 2005 WL 612723, at *3 (S.D.N.Y. Mar. 15, 2005) (Leisure, J.) (citing Noble v. Sheehan, 116 F. Supp. 2d 966, 969 (N.D. Ill. 2000)); see also Baxter Diagnostics, Inc. v. Novatek Med., Inc., No. 94 Civ. 5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (denying a motion *in limine* to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in

scope to be considered prior to trial). Indeed, courts considering a motion *in limine* may reserve

judgment until trial, so that the motion is placed in the appropriate factual context. See Nat'l

Union Fire Ins. Co., 937 F. Supp. at 287 (citing Hawthorne Partners v. AT&T Techs., Inc., 831

F. Supp. 1398, 1400 (N.D. Ill. 1993)). Further, a court's ruling regarding a motion *in limine* is

"subject to change when the case unfolds, particularly if the actual testimony differs from what

was contained in the [movant's] proffer." Luce v. United States, 469 U.S. 38, 41 (1984).

II.    Rule 404(b) Standards

Federal Rule of Evidence 404(b) provides in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character
of a person in order to show action in conformity therewith. It may, however, be
admissible for other purposes, such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). The Supreme Court has set forth four requirements that should be

followed by courts exercising their discretion under Rule 404(b): "Prior bad-acts evidence must

be (1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than

prejudicial. In addition, (4) at defendant's request, the district court should give the jury an

appropriate limiting instruction." United States v. Downing, 297 F.3d 52, 58 (2d Cir. 2002)

(citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988) (Rehnquist, C.J.)). The Second

Circuit has adopted an "inclusionary approach" under Rule 404(b), admitting evidence of prior

crimes, wrongs, or acts "unless it is introduced for the sole purpose of showing defendant's bad

character, or unless it is overly prejudicial under Fed. R. Evid. 403 or not relevant under Fed. R.

Evid. 402." United States v. Pascarella, 84 F.3d 61, 69 (2d Cir. 1996) (citations omitted); see

also United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989). The Court need only determine

by a preponderance of the evidence under Rule 104(a) whether a jury could reasonably find that

the defendant committed the proffered prior acts. See Huddleston, 485 U.S. at 687-90. The

4

district court has broad discretion to admit evidence pursuant to Rule 404(b), and its ruling will not be overturned on appeal absent abuse of discretion. See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000).

The Government, in its memorandum in support of its *in limine* motion, informed the Court that it expected that the main issue in dispute at trial would be whether defendants intended to have the victims killed or to use force to collect the debt. (Gov't Letter 7.) The Government believed it most likely that defendants would argue that they merely were attempting to collect an outstanding debt and that the plot to use force or violence was a mistake or accident. (Gov't Letter 7.) The Government submitted that the prior testimony of Dikili and Durson is probative of Mustafa's intent because it establishes that defendants previously used similar tactics—*viz.*, threats of violence—to collect money. (Gov't Letter 7.)

It is well settled that evidence of prior acts may be admitted to show a defendant's knowledge or intent. See United States v. Bok, 156 F.3d 157, 165-66 (2d Cir. 1998) (finding trial court acted within its discretion in allowing admission of defendant's tax-paying record to prove his intent to commit tax evasion); United States v. Clemente, 22 F.3d 477, 482-83 (2d Cir. 1994) (finding district court's admission of similar act evidence on issues of knowledge and intent proper); United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir.1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that defendant acted with the state of mind necessary to commit the offense charged."). However, evidence of a prior act "should not be admitted as proof of the defendant's knowledge or intent unless the other act is 'sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [or intent] inference advocated by the proponent

5

of the evidence.'" United States v. Aminy, 15 F.3d 258, 260 (2d Cir. 1994) (Kearse, J.) (quoting United States v. Peterson, 808 F.2d 969, 974 (2d Cir. 1987)).

The Court finds that the Government offers Dikili's and Durson's testimony for a permissible purpose other than to show Mustafa's propensity to commit the crimes charged. Moreover, the Court finds that this testimony is relevant to the instant charges as to whether Mustafa possessed the requisite intent or knowledge. Dikili's and Durson's testimony would make it more difficult for a jury to believe that Mustafa's involvement in the events underlying the instant charges was simply the result of an accident or a mistake; it tends to make more probable the fact that Mustafa had intent or knowledge of the use of force. See Fed. R. Evid. 401. In addition, the Government has identified a sufficient similarity between the prior act and the present one sufficient to establish the prior act's relevance. In his ruling setting aside the jury's guilty verdicts on the two hostage-taking counts in the 1995 action, Judge Debevoise stated the following:

> There's evidence that on occasion the defendant threatened to injure Dursun and used fist physical force upon her. . . . There is certainly evidence that threats were conveyed to her and to Dikili for the purpose of prevailing upon Dikili to pay money defendant claimed was owed to him or to sign a note.
> . . . .
> The most persuasive evidence which the government produced to support its contention that Dursun was being held hostage was defendant's note to Dikili demanding he pay the money defendant claimed was due or give a note to secure such payment. The note stated, "Otherwise, I will not allow her [Dursun] to leave."
> Even if this note were interpreted to mean that defendant was going to hold Dursun in captivity until Dikili paid money or gave a note, that constitutes evidence of an attempt to extort money from Dikili. The evidence of what was actually happening to Dursun demonstrates that the note was a threat and no more.

(Trial Tr. 17-18, Aug. 23, 1995.) This evidence of an extortionate collection of a debt is adequately similar to the crime charged here—the similar collection of a debt, which was

to be effectuated by force if necessary—to negative any defense by Mustafa that he had no intent or knowledge of inflicting physical harm in connection with the collection of a debt. See United States v. Garcia, 291 F.3d 127, 137 (2d Cir. 2002) ("The government must identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act."). Indeed, the similarity of the prior act firmly belies any assertion by Mustafa that he unwittingly had sought to collect a debt by force.

Prior-act evidence may be offered to prove the defendant's knowledge or intent only after the defendant has asserted a state of mind defense, thereby putting knowledge and intent at issue. See, e.g., Riverwoods v. Chappaqua Corp., 30 F.3d 339, 345-46 (2d Cir. 1994) (finding intent at issue after defendant asserted in its answer and opening statement that it had no intent to extort); United States v. Myerson, 18 F.3d 153, 166 (2d Cir. 1994) (holding similar acts by defendant admissible when defendant asserted a state-of-mind defense); United States v. Figueroa, 618 F.2d 934, 939 (2d Cir. 1980) (Newman, J.) ("[I]f the evidence is offered to prove the defendant's knowledge or intent, the offer of similar acts evidence should await the conclusion of the defendant's case and should be aimed at a specifically identified issue."). On April 11, 2006, the Court denied the Government's *in limine* motion on the ground that Mustafa had not yet given the Court any indication of what his defense theory would be at trial. (Apr. 11, 2006 Order.) While the Government sought to introduce the prior-act testimony on the assumption that Mustafa would attempt to argue that he lacked the requisite intent for the crimes charged, (Gov't Letter 7), the Court believed that Mustafa's counsel, in his memorandum in opposition to the Government's motion, had given no indication that Mustafa would stipulate to the issue of intent. (Apr. 11, 2006 Order; Mustafa's Letter Opp'n Mot., Mar. 27, 2006 ("Mustafa Letter").)

The Government has now renewed its motion and, given what has transpired during the

course of the first three days of trial, the Court finds that Mustafa's intent has been adequately

put into issue and, therefore, the subject evidence may be admitted in the Government's case-in-

chief. United States v. Inserra, 34 F.3d 83, 90 (2d Cir. 1994) ("While admission of similar act

evidence to prove intent or knowledge generally should await the conclusion of the defendant's

case, such evidence is admissible during the Government's case-in-chief if it is apparent that the

defendant will dispute that issue.") (citations omitted); United States v. Zackson, 12 F.3d 1178,

1183 (2d Cir. 1993) (holding prior-act evidence is admissible in the Government's case-in-chief

where it is apparent that the purpose for which prior-act evidence is admissible will be in

dispute); United States v. Lombardozzi, No. S1 02 Cr. 273, 2003 WL 1907969, at *6 (S.D.N.Y.

Apr. 17, 2003) (Leisure, J.) ("With no indication that the defendant intends to stipulate that he

had the requisite intent and knowledge to commit the crimes charged in the indictment, the Court

will assume that these elements remain sufficiently in dispute for these prior acts evidence to be

probative and relevant.").

While the Government has directed the Court to at least two instances in which it

believes that Mustafa has affirmatively put his own intent at issue,[2] the Court need not even

examine those examples because Mustafa's more general defense theory makes clear that he has

not adequately removed the issue of intent from this trial so as to warrant the exclusion of the

---

[2] The Government argues that two lines of inquiry made by Mustafa's counsel on cross-examination of the Government's cooperating witness, Mohommad Mabrouk, attempt to lay the groundwork for the argument that Mustafa lacked the intent to extort or kill the debtor. (Gov't Letter Supp. Renewed Mot. 2, Apr. 14, 2006.) First, counsel questioned Mr. Mabrouk about whether Mustafa actually used the word "kill" while soliciting his help in effectuating the debt collection, (Trial Tr. vol. 3, 271-72, Apr. 13, 2006), and then sought to discredit Mr. Mabrouk's testimony by claiming that Mr. Mabrouk did not understand what Mustafa had told him because they were speaking in English, neither individual's native tongue (Trial Tr. vol. 3, 271, Apr. 13, 2006). Second, counsel sought to elicit from Mr. Mabrouk an admission that he had told Mustafa that his wife's cousin owned a collection agency that Mustafa could use to collect his debt. (Trial Tr. vol. 2, 197, Apr. 12, 2006.) The Court does not need to ascertain whether these lines of questioning properly put the issue of intent at issue because the Court finds that intent has been put at issue for the reasons set forth above. Of course, to the extent the Government's arguments were found by the Court to be correct, such a finding would only further support its granting of the Rule 404(b) motion.

8

instant evidence. See United States v. Tarricone, 996 F.2d 1414, 1421 (2d Cir. 1993) ("In some circumstances the very nature of a defense put forward by the defendant may itself remove an issue from a case."). A defendant that seeks to prevent the introduction of prior-act evidence on the issue of intent must express to the district court with "'sufficient clarity'" its desire to do so.[3] United States v. Colon, 880 F.2d 650, 657 (2d Cir. 1989) (quoting United States v. Ortiz, 857 F.2d 900, 904 (2d Cir. 1988)). A defendant may do so either "by putting forward a particular theory of defense or by specifically offering to stipulate." Id.

In determining whether a particular theory of defense places the defendant's intent at issue, the Second Circuit differentiates generally between instances where the defendant claims he or she did not commit the crime at all, such as with a defense of mistaken identity, and cases in which the defendant argues that he or she simply acted innocently or mistakenly, thereby acting without the requisite intent required by the particular crime. Id. ("Our cases have thus recognized a distinction between defense theories that claim that the defendant did not do the charged act at all, and those that claim that the defendant did the act innocently or mistakenly, with only the latter truly raising a disputed issue of intent."). In the former case, prior-act evidence that goes to intent is properly foreclosed from admission; in the latter case, such evidence is clearly admissible. Id.

A defense theory that rests exclusively on attacking the credibility of the Government's witnesses is not the equivalent of a defense that the defendant did not commit the crime at all. United States v. Tarricone, 996 F.2d 1414, 1422 (2d Cir. 1993) ("We emphatically disagree with

---

[3] Such an expression of sufficient clarity would justify the Court
    (a) in sustaining objection to any subsequent cross-examination or jury argument that seeks to
    raise the issue and (b) in charging the jury that if they find all the other elements established
    beyond a reasonable doubt, they can resolve the issue against the defendant because it is not
    disputed.

United States v. Colon, 880 F.2d 650, 657 (2d Cir. 1989) (quoting United States v. Ortiz, 857 F.2d 900, 904 (2d Cir. 1988)).

9

Balagula's theory that a defense theory that a defense depending exclusively on attacking the credibility of the government's witnesses is the functional equivalent of a defense that the defendant did not commit the charged acts."). In such cases, prior-act evidence sought to be admitted for the purpose of negating a defense of lack of intent will be admissible because "[a]n attack on the credibility of the government's witnesses is essentially a claim that the government has not met its burden of proof, a proposition quite different from either a claim of innocence or a concession that the government need not prove the defendant's knowledge and intent." Id. Mustafa has put on such a defense theory. His counsel has repeatedly sought to discredit the Government's two witnesses, noting to the jury in his opening statement that such an approach would, indeed, be his plan of proverbial attack. (See, e.g., Trial Tr. vol. 1, 24, Apr. 11, 2006 ("I will show you by cross examination that this man [the Government's primary witness] is totally incredible and that you cannot rely on one thing he says. This whole case is predicated on this man's testimony."). Consequently, the pillar supporting Mustafa's defense is the supposition that the Government will fail to meet its burden of proof because its witnesses are not credible, see Tarricone, 996 F.2d at 1422, and therefore he must be acquitted. Such a defense does not adequately remove the issue of intent from the case. The Court turns to the next step in its Rule 404(b) analysis.

III. Whether the Probative Value of the Proffered Evidence Substantially Outweighs Any Unfair Prejudice to Defendant

A.    General Standards

Having found that the proffered evidence is offered for a proper purpose and relevant, the Court turns to Mustafa's argument that the evidence is inadmissible because it has been offered to demonstrate the character trait of a criminal propensity in order to show action in conformity

10

therewith, or, alternatively, because its probative value is substantially outweighed by the unfair prejudice it will produce to defendant. (Mustafa Letter 2-3.)

The admission of prior-act evidence intended to demonstrate that a defendant's prior bad act is indicative of a bad character trait that in turn raises the inference that the defendant must have committed the currently charged bad act is, of course, impermissible. Fed. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."); Old Chief v. United States, 519 U.S. 179, 180-82 (1997) (characterizing as an improper ground for admission under Rule 404(b) the "generaliz[ation] [of] a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily)"). Justice Jackson, in Michelson v. United States, described why this is so:

> The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

335 U.S. 469, 475-76 (1948) (Jackson, J.) (footnotes omitted); see also Old Chief, 519 U.S. at 181 (quoting Michelson at length in support of its holding). Because the Government argues, and the Court has found, that the evidence sought to be admitted has been proffered not to demonstrate Mustafa's bad character, but instead to negative a lack-of-intent or lack-of-knowledge defense, the Court turns to weigh the probative value of the evidence on these points against the capacity of the evidence to unfairly prejudice Mustafa in the eyes of the jury, with the

11

mindset that propensity evidence is inadmissible. See Old Chief, 519 U.S. at 182 ("There is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence of a prior conviction is subject to analysis under Rule 403 for relative probative value and for prejudicial risk of misuse as propensity evidence.").

A court's consideration of evidence proffered under Rule 404(b) requires the court to weigh the probative value of the evidence against its potential prejudicial effect pursuant to Rule 403. Huddleston v. United States, 485 U.S. 681, 691 (1988) (Rehnquist, C.J.) (holding that in a Rule 404(b) analysis the protection against unfair prejudice to a defendant emanates from, *inter alia*, "the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice"); United States v. Downing, 297 F.3d 52, 58 (2d Cir. 2002); United States v. Figueroa, 618 F.2d 934, 942 (2d Cir. 1980) (Newman, J.); United States v. Williams, 577 F.2d 188, 191 (2d Cir. 1978) ("[I]f the judge finds the evidence is relevant, he must also determine that the probative worth of, and the Government's need for, the evidence is not substantially outweighed by its prejudice to the defendant.").

While evidence offered against a defendant that is material to an issue in the case will consequently tend to prove guilt, the Second Circuit has held that such evidence "is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." Figueroa, 618 F.2d at 943; accord Fed. R. Evid. 403 advisory committee notes ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."). The fear is that the evidence will prejudice the defendant by reason of proving an adverse *immaterial* fact, or by simply exciting the emotions of the jurors against the

12

defendant. Figueroa, 618 F.2d at 943; see also id. ("When material evidence has an additional prejudicial effect, Rule 403 requires the trial court to make a conscientious assessment of whether the probative value of the evidence on a disputed issue in the case is substantially outweighed by the prejudicial tendency of the evidence to have some other adverse effect upon the defendant.").

The Supreme Court has instructed that district courts must take care to determine whether there exists any alternative evidence with the same or greater probative value, but with a lesser threat of unfairly prejudicing the defendant, as the proffered evidence. If so, the court must discount the probative value of the originally proffered evidence and exclude it if its now lesser probative value is substantially outweighed by unfair prejudice to the defendant. Old Chief v. United States, 519 U.S. 172, 182-83 (1997) ("If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk."); accord Rule 404 advisory committee notes ("The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence *in view of the availability of other means of proof* . . . .") (emphasis added).

## B. The Parties' Arguments

Mustafa argues that the probative value of the evidence of his involvement in a scheme in which he made extortionate threats of violence is substantially outweighed by the unfair prejudice that will accrue to him in the jurors' minds. (Mustafa Letter 2.) He specifically argues that the evidence is not probative of his intent or knowledge because of its age—the charges are twelve years old—and because he was eventually acquitted of the charges due to the unreliability

13

of Dursan's and Dikili's testimony. (Mustafa Letter 1.) Finally, he argues that, relative to the present charges, the prior charge of hostage taking, coupled with the corresponding extortionate threats that he was alleged to have made, are "equally sensational and disturbing" (Mustafa Letter 2) as the charges here, and, therefore, are unduly prejudicial.

The Government argues that the evidence is offered for a proper purpose, and that its probative value is not substantially outweighed by the potential for unfair prejudice to Mustafa. (Gov't Letter 7-8.) The Government argues in response to Mustafa's arguments that he mischaracterizes the reasons for Judge Debevoise's acquittal of him on the two prior charges, and offers a transcript of Judge Debevoise's oral ruling on the charges to substantiate its claim that Judge Debevoise found that, while insufficient to permit the jury to find him guilty, there was evidence that Mustafa attempted to extort money from another by use of a threat. (Gov't Letter 1, 3.)

## C.     The Parties' Arguments Under Rule 403 and the Relevant Case Law

Mustafa's argument that the proffered evidence should be excluded under Rule 403 rests on his contentions that the age of the prior charges gives the evidence little probative value, and the nature of the prior charges is so sensational and disturbing that it would enflame the jury to such a degree as to substantially outweigh any probative value it might have. (Mustafa Letter 1.)

The remoteness in time of a prior act, while not dispositive in a Rule 404(b) analysis, should be considered by a district court in making its admissibility determination. Figueroa, 618 F.2d at 942 (holding that in a Rule 404(b) analysis, Rule 403 "oblige[s] the trial court to assess the probative value of every prior conviction offered in evidence and the remoteness of a conviction, whatever its age, is always pertinent to this assessment"). While the Court recognizes that twelve years is a relatively long period of time, the Second Circuit has held that

14

where relevant and adequately probative prior-act evidence will help a jury shed light on the issues before it, such evidence may be admitted, notwithstanding a relatively longer passage of time since the commission of the prior act. United States v. Martino, 759 F.2d 998, 1005 (2d Cir. 1985) (finding no abuse of discretion in admitting an eleven-year-old conviction where "the prior conviction of federal narcotics offenses was evidence which could be interpreted by the fact-finders as shedding light on these key issues . . . [and] the evidence was both relevant and probative"). The Court finds that the evidence will indeed shed a light on any lack-of-intent defense employed by Mustafa. Defendant's prior threats of harm made in connection with the collection of a debt are very similar to the allegations herein that Mustafa sought out someone to collect a debt for him (using force if necessary) and then kill the debtor. Such similarities would likely prove to serve as strong counter-evidence that Mustafa had no knowledge that the person he commissioned to collect a debt for him would employ violence in connection therewith. See United States v. Gubelman, 571 F.2d 1252, 1255 (2d Cir. 1978) ("[T]estimony concerning extremely similar acts is not inflammatory in the way that an unrelated violent crime might be.").

The Court simply cannot accept Mustafa's argument that his prior charge of hostage taking, and the extortionate threats of harm made in connection with that hostage taking, are as equally sensational and disturbing as hiring someone to kill another in the collection of a debt. While the former charge was a serious one, the employment of murder in connection with the collection of a debt is surely more serious. Where prior-act evidence is no more serious than the presently charged crime(s), courts have found that the Rule 404(b) analysis may tip in favor of admission. See United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990) (holding that defendant was not unfairly prejudiced where the evidence admitted under Rule 404(b) "did not involve conduct any more sensational or disturbing than the crimes with which [defendant] was

15

charged"); United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992) ("Moreover, the evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged.'" (quoting Roldan-Zapata, 916 F.2d at 804)).

Consequently, while there undoubtedly is the possibility that an unfair prejudicial effect will accrue to defendant in that the jury will know that he was charged—but not convicted—of these prior acts, the Court believes in its discretion that such prejudice does not substantially outweigh the probative value of the evidence.[4] The proffered evidence tends to show in satisfaction of Rule 401 that a defense by Mustafa that he lacked the intent to order physical harm in connection with the collection of a debt is unbelievable. Further, and quite importantly, while the risk of unfair prejudice exists, Mustafa has not offered the Court any alternative evidence on this point, such as a stipulation that he did not lack intent or knowledge, that the Court could evaluate relative to the Government's proffer. See Old Chief v. United States, 519 U.S. 172, 182-83 (1997) (requiring that a district court in a Rule 404(b) analysis consider other evidence with equal or greater probative force but lesser risk of unfair prejudice). The Court therefore is faced only with evidence—prior bad acts—that is unquestionably a forceful indicator of Mustafa's state of mind—more specifically, his intent and knowledge. See Huddleston v. United States, 485 U.S. 681, 685 (1988) (Rehnquist, C.J.) ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing

---

[4] As noted above, district courts retain a great degree of leeway in assessing the probative value and prejudicial effect that a piece of evidence might have:

> To find an abuse of discretion, defendants must show that the trial court acted "arbitrarily or irrationally." This is a difficult burden to meet. Defendants' burden is made more onerous by the fact that we "must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect."

United States v. Arango-Correa, 851 F.2d 54, 58 (2d Cir. 1988) (quoting United States v. Birney, 686 F.2d 102, 106 (2d Cir.1982); United States v. Jamil, 707 F.2d 638, 642 (2d Cir.1983)).

16

inferences from conduct."). Finally, the Court believes that an appropriate limiting instruction

commanding the jury to only use the evidence for the purpose of negating a defense of lack of

intent or knowledge will assuage any prejudicial effect. See United States v. Araujo, 79 F.3d 7,

8 (2d Cir. 1996) ("Although there is no doubt that the testimony in question carried with it some

possibility of prejudice, we cannot say that the district court abused its discretion in admitting the

testimony, particularly in light of the instruction to the jury limiting its consideration of the

evidence to the issue of trust and confidence . . . .").[5]

## D.     Potential Spillover Prejudice to Osman

The Court turns briefly to another potentially prejudicial effect the instant evidence may

have, which Osman, but not Mustafa, raises in his opposition papers (Osuna Letter Opp'n Mot.

4, Mar. 28, 2006): the potential prejudice to Osman, as co-defendant in this action, that he might

incur collaterally even though the Government solely moves to admit the instance evidence

against Mustafa.[6]

The Second Circuit recognizes the potential "spillover" prejudice that a co-defendant

may incur in a joint trial where prior-act evidence is admitted against another co-defendant.

---

[5] Mustafa's other arguments are without force. Mustafa's argument that his acquittal on the prior charges somehow makes them inadmissible, or, at least, less probative, is foreclosed by the Supreme Court's decision in Dowling v. United States, 493 U.S. 342, 348 (1990). In Dowling, the Court held that otherwise admissible prior-act evidence is admissible under Rule 404(b), regardless whether it relates to alleged criminal conduct for which the defendant was acquitted. Id. See generally 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 404.21(2)(b) (Joseph M. McLaughlin ed., Mathew Bender 2d ed. 2005) ("[A] court may permit the introduction of evidence of a crime for which the defendant has actually been acquitted. The philosophy behind this apparently startling result is that a jury must find a person guilty beyond a reasonable doubt to convict, whereas the standard for admitting other-crime evidence is lower."). Mustafa's other argument that Dursun's and Dikili's testimony was unreliable is not found in the record of Judge Debevoise's oral ruling. Judge Debevoise acquitted Mustafa on the conspiracy charge because the Government had not demonstrated the existence of another coconspirator. (Trial Tr. 16, Aug. 23, 1995). Mustafa was acquitted on the substantive charge of hostage taking because the government had not adequately demonstrated that a required element of the claim—that Mustafa had seized Dursun for an appreciable length of time or that the demand that Dikili pay was in exchange for Dursun's release—had been established. (Trial Tr. 17-18, Aug. 23, 1995.) In neither acquittal did Judge Debevoise mention the credibility of Dursun's or Dikili's testimony.

[6] The Government originally sought to admit this evidence against both defendants, but withdrew its motion as against Osman in its reply papers. (Gov't Reply Letter Supp. Mot. 1, Mar. 29, 2006).

United States v. Gelzer, 50 F.3d 1133, 1140 (2d Cir. 1995) ("Where allegedly prejudicial evidence is admitted solely against one defendant in a multi-defendant trial, the prejudice this might cause to his co-defendants is an appropriate consideration for Rule 403 balancing and may result in the exclusion of such evidence in the joint trial."); United States v. Figueroa, 618 F.2d 934, 944 (2d Cir. 1980). If the evidence admissible against one defendant creates a significant risk of prejudice to a co-defendant, the court must answer the additional question whether the evidence may still be admitted, "even though limited by cautionary instructions to the 'case' of a single defendant." Figueroa, 618 F.2d at 944. "If the justification for a joint trial is outweighed by the prejudice to the co-defendants, the trial court can confront the prosecutor with the choice of forgoing either the evidence or the joint trial." Id. The court must look to the efficacy of a limiting instruction that directs the jury to only consider the evidence against the defendant against whom it is offered. Id. at 946. The concern is that the jury might draw an adverse inference against a co-defendant simply because of his or her association with, as in this case, a defendant previously charged with a particular crime. See id.; United States v. Rosenwasser, 550 F.2d 806, 813-14 (2d Cir. 1977) ("'[P]rior similar acts of misconduct performed by one person cannot be used to infer guilty intent of another person who is not shown to be in any way involved in the prior misconduct, unless it be under a 'birds of a feather' theory of justice. Guilt, however, cannot be inferred merely by association.'" (quoting United States v. DeCicco, 435 F.2d 478, 483 (2d Cir. 1970))). Where the prior-act evidence does not include or implicate another co-defendant's involvement, a cautionary limiting instruction will usually be ample to guard against unfair prejudice. See, e.g., Rosenwasser, 550 F.2d at 808 ("[W]hen similar act evidence is admitted in a multiple defendant trial, it is clear that the co-defendant claiming prejudice could not have been involved in the similar offense. In those circumstances, there is

18

little doubt that a cautionary instruction is sufficient to preserve the co-defendant's right to a fair trial."). However, a great—in fact, the greatest—threat of prejudice occurs in the situation where the evidence admitted against the defendant "tends to prove directly, or even by strong implication, that the co-defendants also participated in the prior act." Figueroa, 618 F.2d at 946; see also Rosenwasser, 550 F.2d at 814 ("Here the prejudice was more severe, for the jury, affected by the prosecutor's drawing the very inference in his opening statement, must have been left with the gnawing suspicion that appellant might have had something to do with the similar offense, thereby raising 'a prejudicial atmosphere of guilt by innuendo.'" (quoting DeCicco, 435 F.2d at 482 n.5)).

Here, the Government has submitted to the Court along with its renewed motion a transcript of Dursun's and Dikili's prior sworn testimony from the prior action involving Mustafa. The Court was previously privy only to the transcript of Judge Debevoise's oral ruling on the prior two counts in question. That ruling explicitly states that the basis for Mustafa's acquittal on the count of conspiring to take a hostage was that the Government had failed to prove beyond a reasonable doubt a required element of that claim—the existence of another participant in the conspiracy. (Trial Tr. 16, Aug. 23, 1995.) The uncharged, but alleged, coconspirator in that action was Osman. The court described the evidence concerning Osman's involvement in the purported conspiracy as follows:

There is ample evidence that Osnan [sic] knowingly participated with his
father in bringing and attempting to bring the Turkish aliens into the United
States. There is ample evidence that he knowingly participated with his father in
attempting to collect money from Dikili in Turkey. There is ample testimony that
defendant told Dursun and Dikili that he would not send Dursun back to Turkey
unless Dikili paid or gave a note to Osmman [sic].

However, there is no evidence that Osnan [sic], who was in Turkey, was
aware of the circumstances under which Dursun was being held in Paterson, New
Jersey or that part of the alien smuggling operation or the attempt to obtain
payment from the smuggled aliens included holding Dursun as a hostage.

(Trial Tr. 15-16, Aug. 23, 1995.)

The proffered prior sworn testimony of Dursun and Dikili that the Government seeks to

admit in its entirety, and then have a summary witness generally summarize through testimony

(Gov't Letter Supp. Renewed Mot. 3), accords with Judge Debevoise's oral ruling. That is, it

touches on Osman's involvement in Mustafa's alien smuggling ring, but does not implicate him

in the alleged hostage taking. As stated above, the Second Circuit has clearly warned of the

potential for unfair prejudice in instances where the admission of prior-act evidence against one

defendant tends to prove directly or implicate another defendant's involvement in the prior act.

Figueroa, 618 F.2d at 946 ("At the other extreme is the high risk of prejudice to co-defendants

when evidence of a defendant's prior act . . . tends to prove directly, or even by strong

implication, that the co-defendants also participated in the prior act."); Rosenwasser, 550 F.2d at

808 (finding the question of admissibility to be a "close call" where the evidence admitted

against one defendant "was not so clearly unrelated to the charges" against another co-

defendant). With this standard in mind, the Court notes that the evidence proffered by the

Government to attack any defense of intent made by Mustafa is testimony from a prior trial

concerning threats made by Mustafa in connection with the collection of a debt. While the court

in that prior action explicitly held that the evidence demonstrated that Osman had taken part in

Mustafa's alien smuggling ring, it also held that there was "no evidence that Osnan [sic], who

was in Turkey, was aware of the circumstances under which Dursun was being held in Paterson, New Jersey or that part of the alien smuggling operation or the attempt to obtain payment from the smuggled aliens included holding Dursun as a hostage." (Trial Tr. 16, Aug. 23, 1995.)

Because the evidence only references Osman's involvement in an alien smuggling conspiracy, but not the taking of any hostages or making any threats of harm in connection therewith, the Court believes that the present situation is adequately distinguishable from the hypothetical situation envisioned by the Figueroa Court in which the prior-act evidence proves directly, or tends to imply, a co-defendant's involvement with the prior act. 618 F.2d at 946. The Court stresses that the operative prior act in question is the hostage taking and conspiracy to take a hostage, the pertinent part of which was the threat of harm to collect a debt. Osman is not implicated in making any such threats or knowing of any such threats: "They [*i.e.*, the Government] do not show he was a party to any conversation or document which could be interpreted as a threat to hold Dursun hostage until the money was paid." (Trial Tr. 16, Aug. 23, 1995.) Consequently, the Court finds that a proper limiting instruction will adequately guard against any collateral prejudice to Osman by virtue of admitting the instance evidence against Mustafa. See United States v. Reed, 639 F.2d 896, 907 (2d Cir. 1981) (finding a cautionary instruction adequate to preserve a co-defendant's right to a fair trial where no claim was made that the co-defendants had any connection with the similar conduct).

## IV. Admission of Prior Sworn Testimony Under Rule 804(b)(1)

Having found that the proffered evidence is admissible under Rule 404(b), the Court turns to the question whether Dursun's and Dikili's prior sworn testimony, which, as out-of-court statements offered for the truth would otherwise be inadmissible hearsay, are nonetheless admissible. This inquiry has two components—the first statutory and the second constitutional.

21

## A.    Rule 804(a)(5) Standards

First, the testimony must be admissible under an exception to the hearsay rule. The

Government submits that the testimony is admissible under Federal Rule of Evidence 804(b)(1).

Where a declarant is unavailable as a witness, Rule 804(b)(1) provides for the introduction of

certain prior testimony:

> Testimony given as a witness at another hearing of the same or a different
> proceeding, or in a deposition taken in compliance with law in the course of the
> same or another proceeding, if the party against whom the testimony is now
> offered, or, in a civil action or proceeding, a predecessor in interest, had an
> opportunity and similar motive to develop the testimony by direct, cross, or
> redirect examination.

Fed. R. Evid. 804(b)(1). The admission of a declarant's out-of-court statement under a Rule

804(b) hearsay exception is contingent on the declarant's unavailability. Fed. R. Evid. 804(a).

See generally 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence §

804.03(1) (Joseph M. McLaughlin ed., Mathew Bender 2d ed. 2005) ("Unavailability is the all-

important condition precedent to the admission of hearsay statements under the exceptions that

are included in Rule 804(b)."). The Government informs the Court that while it believes Dikili

and Durson are located in Turkey, it has been unable to locate them despite diligent efforts to do

so. (Gov't Letter Supp. Renewed Mot. 3, Apr. 14, 2006.) Inability to locate a witness invokes

the Rule 804(a)(5) unavailability exception, which states that a declarant is adequately

unavailable where "the proponent of a statement has been unable to procure the declarant's

attendance . . . by process or other reasonable means." Fed. R. Evid. 804(a)(5).

The question whether a witness is truly unavailable is left to the sound discretion of a

district court, and the Second Circuit will not be quick to overturn a district court's decision.

United States v. Bell, 500 F.2d 1287, 1290 (2d Cir. 1974). Assuming Dursun and Dikili are in

fact located in Turkey, and neither defendant has argued otherwise, they are outside the power of

22

this Court's compulsory process. See, e.g., United States v. Losada, 674 F.2d 167, 172 (2d Cir. 1982) ("Lemos is a Colombian citizen living in Colombia and is not subject to compulsory process. The only issue, therefore, is whether the government used 'other reasonable means,' such as a voluntary request, to obtain his attendance."). The question, then, is whether the Government has used "other reasonable means" to locate these missing witnesses. Id. While there is no hard-and-fast rule as to what constitutes the reasonable means that a proponent of the evidence must undertake, some affirmative steps must be taken. See, e.g., id. ("The government submitted an affidavit and memorandum detailing its efforts to obtain Lemos' attendance. Judge Dooling properly accepted the government's representations and ruled that Lemos' prior testimony was admissible."); United States v. Sindona, 636 F.2d 792, 804 (2d Cir. 1980) (finding that other reasonable means had been adequately employed where, prior to being informed that the witnesses refused to testify, the Government had been in contact with the four witnesses for between four and twelve months and the Government had promised to pay the witnesses' expenses incurred in traveling to the U.S. to testify); see also United States v. Ochoa, 229 F.3d 631, 637-38 (7th Cir. 2000) (holding that the Government had undertaken adequate means where it spent "several days" trying to locate the witness, it spoke to the witness's employer, landlord, and other individuals, and obtained a material witness arrest warrant). See generally 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 804.03(6)(c) (Joseph M. McLaughlin ed., Mathew Bender 2d ed. 2005) ("In federal trials, the prosecution should assume that a declarant will not be found unavailable unless it shows that it exhausted all statutory provisions relating to service of subpoenas and, in addition, made a good-faith effort to obtain the declarant's voluntary appearance."). While it is preferable that a proponent offer, for example, an affidavit setting forth what good-faith efforts it took to locate a witness, a district

court may question counsel and accept his or her oral assertions concerning why a witness is unavailable. Sindona, 636 F.2d at 804 ("Although it would have been preferable to present the court with affidavits, the fact that the trial counsel for the Government presented the factual situation orally is not fatal. It is proper for the court to accept, in its discretion, the representations or counsel with respect to the unavailability of a witness."). See generally 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 804.03(6)(e) (Joseph M. McLaughlin ed., Mathew Bender 2d ed. 2005) ("Unavailability on the ground of inability to procure attendance may be determined without a formal hearing and unencumbered by the rules of evidence except those concerning privileges."). The Government, in its written submission renewing its motion, did not detail any steps that it had taken in locating the witnesses, instead only noting that it had employed "diligent efforts" to locate them. (Gov't Letter Supp. Renewed Mot. 3, Apr. 14, 2006.)

On April 17, 2006, outside the presence of the jury, the Court inquired with the Government about what steps it had taken to locate the witnesses. The Government first explained that Dursun and Dikili had been brought to the United States to testify in the prior action against Mustafa on limited parole. The Government has since conducted interviews concerning the witnesses' whereabouts and were told that they had returned to Turkey. With this understanding, the Government provided the Federal Bureau of Investigation ("FBI") with identifying information for Dursun and Dikili, which the FBI then passed on to an FBI contact in Turkey, who in turn contacted Turkish law enforcement authorities. Despite this effort, Dursun and Dikili could not be found.

The Court inquired as to whether the Government had utilized any of the tools available to it under the extradition treaty in place between Turkey and the United States, under which,

*inter alia*, either nation may request that the other nation attempt to locate an individual who the requesting party believes to be present within the other country's borders. The party receiving the request shall "make every effort to ascertain the whereabouts and addresses of such persons in its territory." Treaty on Extradition and Mutual Assistance in Criminal Matters between the United States of America and the Republic of Turkey, June 7, 1979, U.S.-Turk., art. 37, 32 U.S.T. 3111. The Government responded by explaining that it considered utilizing the treaty but believed that its use would be futile given the fact that Turkish nationals residing in Turkey fall outside the scope of the Court's subpoena power. While the Court agrees, cf. 28 U.S.C. § 1783(a) (2000) (allowing a court to issue a subpoena requiring to appear as a witness before it any U.S. national or resident residing in a foreign country); Fed. R. Crim. P. 17(e)(1) ("A subpoena requiring a witness to attend a hearing or trial may be served at any place within the United States."); United States v. Mejia, 376 F. Supp. 2d 460, 465 (S.D.N.Y. 2005) ("Because Medina is a Dominican citizen residing in the Dominican Republic, his presence cannot be obtained through the process of serving him with a subpoena."), the treaty does provide for, as quoted above, certain obligations each country must undertake with respect to, for example, helping locate individuals within its borders. Such obligations, however, as the Government notes, do not serve as a mechanism under which either nation must compel a witnesses' attendance in the other country. Further, because the measures undertaken by the Government in locating the witnesses mirror generally the steps that would have been taken under the treaty, the Court finds that the failure to invoke the treaty is not fatal.[7] (It is also likely that the

---

[7] In at least one instance, the Second Circuit stated in a footnote that a witness's unavailability under Rule 804(a)(5) was sufficiently established where the witness was a Colombian citizen located in Colombia and there was no extradition treaty between the countries. United States v. Losada, 674 F.2d 167, 172 n.1 (2d Cir. 1982) ("[I]n the absence of an extradition treaty with the country in which the unavailable witness was located, the witness' unavailability was sufficiently established."). While it is not precisely clear whether, in the instance where an extradition treaty does exist, this language obligates the proponent of the evidence to utilize whatever powers it

25

Government's chosen course was more expeditious anyway.) Finally, the defendants, in response to the Government's proffer, did not argue that the Government had not undertaken good-faith efforts, or that the Government could have taken other, more productive steps in locating the witnesses. See United States v. Losada, 674 F.2d 167, 172 (2d Cir. 1982) ("Absent any showing whatsoever by . . . [defendant-appellant] that the government could have obtained the presence of Lemos at trial or that it had acted in bad faith, there is no basis for disturbing Judge Dooling's ruling."); Mejia, 376 F. Supp. 2d at 465 (citing Losada for same proposition). The Court is, therefore, satisfied that the Government has exercised reasonable means in attempting to locate Dursun and Dikili.

B.     Confrontation Clause Considerations

In addition to Rule 804(a)(5)'s requirements, the Confrontation Clause of the U.S. Constitution also requires that "testimonial" evidence, which includes statements made at a previous trial, United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004) (Sotomayor, J.) ("Although the Court declined to 'spell out a comprehensive definition of 'testimonial,'' it provided examples of those statements at the core of the definition, including prior testimony at a preliminary hearing, previous trial, or grand jury proceeding . . . ." (quoting Crawford v. Washington, 541 U.S. 36, 51, 68 (2004) (Scalia, J.))), sought to be admitted against a defendant from a witness not present at trial may only be admitted where the witness is unavailable and the defendant had an opportunity to cross-examine the defendant in a prior proceeding. See Crawford, 541 U.S. at 68 ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination."); Saget, 377 F.3d at 226 (Sotomayor, J.) ("Crawford abrogates Roberts with

might have under the extradition treaty, the Court has found that, because the Government's measures approximate the measures that would have been taken underneath the treaty, the Government's efforts are adequate.

26

respect to prior testimonial statements by holding that such statements may never be introduced against the defendant unless he or she had an opportunity to cross-examine the declarant . . . .").

In order for a witness to be "unavailable" for constitutional purposes, the proponent of the evidence must have undertaken "'good faith efforts'" to procure the subject witness's attendance. Ohio v. Roberts, 448 U.S. 56, 74-75 (1980) ("'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." (quoting California v. Green, 399 U.S. 149, 189 (1970))); Christie v. Hollins, 409 F.3d 120, 125 (2d Cir. 2005) (Newman, J.) ("[T]he prior recorded and cross-examined testimony of a witness is admissible if the witness is unavailable despite 'good faith efforts' to secure the witness's attendance." (quoting Roberts, 448 U.S. at 74)). See generally 31 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 7072 (3rd ed. 2004) ("In criminal cases the confrontation clause also requires that the government make a good faith effort to obtain the presence of the witness at trial going beyond the mere showing of an inability to compel appearance by subpoena before prior testimony may be introduced as a substitute for testimony."). The question whether a party's efforts have been made in good faith is a question of degree. Barber v. Page, 390 U.S. 719, 724-25 (1968) ("In short, a witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."); see also United States v. Kehm, 799 F.2d 354, 360 (7th Cir. 1986) (Easterbrook, J.) ("Neither Rule 804(a)(5) nor the constitution requires the prosecutor to butt his head against a wall just to see how much it hurts. . . . [T]he question is not one of absolutes, it is one of degrees, and a favorable outcome need not be certain to make it necessary to act."). The Court finds that the Government made a good-faith

27

effort in attempting to locate Dursun and Dikili for the same reasons such efforts were ample to satisfy the requirements of Rule 804(a)(5)—specifically, inquiring as to the witnesses' whereabouts after testifying in the prior trial, determining identifying characteristics of the witnesses, and utilizing law enforcement authorities to attempt to locate the individuals within Turkey. See Christie, 409 F.3d at 125 ("[N]othing in the record supports a belief that Smith could have been located to effect service of a subpoena, or that, had she learned of the trial date, a subpoena would have been necessary to secure her attendance.").

The next part of the constitutional question requires that where, as here, prior testimony is sought to be admitted at a later proceeding, the party against whom the testimony is admitted must have had an opportunity to "cross-examine the witness at the earlier proceeding sufficient to endow the testimony as a whole with some 'indicia of reliability'; 'the trier of fact [must have] a satisfactory basis for evaluating the truth of the prior statement.'" United States v. Ciak, 102 F.3d 38, 43 (2d Cir. 1996) (quoting Mancusi v. Stubbs, 408 U.S. 204, 216 (1972)) (bracket in original). A district court determines whether prior testimony is constitutionally adequate by reviewing the prior testimony to determine whether the cross-examination of the testimony "imbues the testimony with the requisite 'indicia of reliability.'" Id. at 44 (quoting Roberts, 448 U.S. at 70-71). Having reviewed the transcript of Dursan's and Dikili's prior testimony from Mustafa's prior action, the Court is satisfied that the cross-examination of those witnesses' testimony was more than adequate to ensure its reliability.[8] See id. ("Our review of the transcript in the instant case convinces us that Wieselman's cross-examination easily imbues Reed's testimony with the reliability necessary to survive the defendant's Confrontation Clause

---

[8] The transcript of the trial includes fifty-eight pages of Dursun's cross-examination and forty-four pages of Dikili's cross-examination during which both witnesses were vigorously questioned on their direct testimony.

challenge. Indeed, the transcript reveals a serious effort by Wieselman to undermine and discredit Reed's testimony.").

## C.    Rule 804(b)(1) Standards

Having found that Dursun and Dikili are both adequately unavailable under Rules 804(a)(5) and the U.S. Constitution, the Court looks to the question whether, through cross-examination, Mustafa had an opportunity and similar motive to develop the testimony admitted against him in his prior proceeding. See Fed. R. Evid. 804(b)(1). The Second Circuit has stated that

[t]estimony given at a previous trial or at a pre-trial hearing by a presently unavailable witness is inadmissible at a subsequent trial unless the issues in the two proceedings are sufficiently similar to assure that the opposing party had a meaningful opportunity to cross-examine when the testimony was first offered.

United States v. Wingate, 520 F.2d 309, 316 (2d Cir. 1975). Where "both proceedings are trials and the same matter is seriously disputed at both trials, it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial." United States v. DiNapoli, 8 F.3d 909, 912-13 (2d Cir. 1993) (en banc) (Newman, J.); see also id. ("The nature of the two proceedings—both what is at stake and the applicable burden of proof—and, to a lesser extent, the cross-examination at the prior proceeding—both what was undertaken and what was available but forgone—will be relevant though not conclusive on the ultimate issue of similarity of motive."). In the prior proceeding, Mustafa's counsel had a strong motive both to discredit the witnesses' testimony as unreliable, and attack the claim that Dursun was afraid of Mustafa because he had threatened harm to her.[9] The motivation lay in the desire to acquit Mustafa on the substantive

---

[9] For example, Mustafa's counsel questioned whether Dursun could have been afraid of Mustafa yet still have been able to muster the courage to ask him to spend his own money to buy her a ticket back to Turkey. (See Trial Tr.

hostage taking and conspiracy charges, of which the Court eventually acquitted Mustafa. In the instant action, a critical issue—if not *the* critical issue—is whether Mustafa intended to collect the debt through the use of force or threats of violence. Consequently, the Court finds that the issues in both proceedings are sufficiently similar, and that Mustafa had an adequate opportunity and similar motive to develop the testimony against him in the prior proceeding. The prior sworn testimony of Dursun and Dikili is, therefore, admissible.

Finally, as noted above, the Court invites counsel to propose limiting instructions regarding the evidence for submission to the jury at the time of the evidence's admission. See United States v. Downing, 297 F.3d 52, 58 (2d Cir. 2002).

## CONCLUSION

For the foregoing reasons, the Government's motion *in limine* is GRANTED.

**SO ORDERED.**
**New York, New York**

April **18**, 2006

Peter K. Leisure
U.S.D.J.

---

190, May 23, 1995 ("But you weren't too afraid that he—to ask that he spend more money on your behalf, were you?").).

30