

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/28/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

- against -

MUSTAFA OZSUSAMLAR and
OSMAN OZSUSAMLAR,

Defendants.

**OPINION AND ORDER**

S1 05 Cr. 1077 (PKL)

**APPEARANCES**

MICHAEL J. GARCIA, ESQ.
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
Miram E. Rocah, Esq.

Attorney for United States

OSMAN OZSUSAMLAR, #53271-054
Metropolitan Detention Center Brooklyn
P.O. BOX 329002
Brooklyn, NY 11232

Pro Se Defendant

FRANK ROTHMAN, ESQ.
Rothman, Schneider, Soloway & Stern, L.L.P.
100 Lafayette Street, Suite 501
New York, NY 10013

Standby Attorney for Defendant

**LEISURE**, **District Judge**:

On April 20, 2006, following a one-week trial, defendants Musfafa Ozsusamlar ("Mustafa") and Osman Ozsusamlar ("Osman") were convicted by a jury of one count of conspiracy to commit a murder-for-hire, in violation of 18 U.S.C. § 1958(b); one count of murder-for-hire, in violation of 18 U.S.C. §§ 1958; and one count of conspiracy to commit extortion, in violation of 18 U.S.C. § 1951.

On July 31, 2007, the parties appeared before this Court at the request of the Government, pursuant to United States v. Fatico, 579 F.2d 707 (2d Cir. 1978) (the "Fatico Hearing"). At the Fatico Hearing the Government presented evidence in support of its claim that an upward adjustment from the sentence recommended in the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is appropriate as to Osman.

Specifically, the Government proved by a preponderance of the evidence that an increase in Osman's sentence above the Guidelines Range calculated in the Pre-Sentence Report ("PSR") is appropriate based on (1) an enhancement for obstructing and impeding the administration of justice, pursuant to U.S.S.G. § 3C1.1; (2) an upward departure for circumstances of a kind not adequately taken into consideration by the guidelines, pursuant to U.S.S.G. § 5K2.0(a)(2)(B); and (3) pursuant to the factors in Title 18, United States Code, Section 3553(a).

1

## BACKGROUND

### I.    Factual Background

The events underlying the charges took place between August 2005 and October 2005, and involved a scheme, brought to light through the use of an undercover agent and a government informant, in which Mustafa and Osman conspired to hire someone to collect a debt from, and subsequently to murder, a married couple (the "Batcas").  The Batcas were not harmed.

### II.   Post-Trial Activities

The Pre-Sentence Report for Osman was originally submitted to the parties in June 2006.  The Court was prepared to sentence Osman nearly a year ago; however, just prior to sentencing, Osman informed the Court via letter that he disagreed with his Pre-Sentence Report and that he wished to change lawyers or to proceed pro se.  In a conference held February 26, 2007, this Court discussed with Osman the perils of proceeding pro se, as outlined in United States v. Hurtado, 47 F.3d 577, 583 (2d Cir. 1995), and, after Osman agreed that he would prefer a new attorney, the Court relieved Osman's lawyer, Robert Osuna, Esq. and appointed Martine Beamon, Esq. from the CJA panel as Osman's counsel.  On March 29, the Court relieved Ms. Beamon of her representation due to a potential conflict of interest.  Robert Soloway, Esq. from the CJA panel was appointed at that time. Frank Rothman, Esq., who is a named partner at Mr. Soloway's law

firm, has represented Osman since that time, and is currently Osman's stand-by counsel.

On April 12, 2007, the Court received another written communication directly from Osman requesting that the Court allow him to proceed pro se, with stand-by counsel. At a conference held May 1, 2007 to discuss his request, the Court again discussed with Osman the pitfalls of proceeding pro se, as outlined in Hurtado. At that time Osman stated on the record that he wished to withdraw his application, and that he would continue to be represented by Mr. Rothman. He further stated that he understood that he was to communicate with the Court only through his lawyer, and that he would have the opportunity to address the Court at sentencing.

Following the May 1, 2007 hearing, the Court was contacted directly by Osman nine times.[1]  In some cases the letters were addressed to Mr. Rothman, but were sent directly to the Court instead.  Other letters were addressed directly to this Court, though one was sent to Chief Judge Wood.  Three of the letters were written in Turkish.  A letter from Osman dated May 7, 2007 included some language threatening the Court, and as a result the U.S. Marshals Service was alerted.  All of these

---

[1] In total, this Court has received no fewer than twelve communications directly from Osman since the conclusion of his trial. Most of these communications were sent while he was represented by counsel, and were therefore returned to Osman with a letter indicating that his concerns regarding his trial should be addressed through his counsel.

3

communications involved Osman's concerns regarding the evidence presented at the trial, as he believes it was tampered with. Copies of all of these communications were sent to Mr. Rothman and to the Government. The result of these numerous communications to the Court has been an extended and needless delay of Osman's sentencing.

On June 28, 2007, based partly on an April 8, 2007 submission by Osman, Mr. Rothman submitted a Sentencing Memorandum to the Court on behalf of Osman.

On July 17, 2007, at yet another hearing to discuss Osman's complaints to the Court about his representation, Osman stated that he "would like to continue pro se but [with] stand-by counsel." (7/17 Tr. at 24-25.) Mr. Rothman then conferred with his client, and confirmed to the Court that Osman "wants to proceed pro se with me as standby counsel." (7/17 Tr. at 26.)

The Government submitted its Sentencing Memorandum ("Gov't Memo") as to Osman's sentence on July 18, 2007, and in that Memorandum the Government set forth arguments supporting its belief that an enhancement to Osman's sentence is appropriate, and requesting the Fatico Hearing. (Gov't Memo at 2-3.)

III. Evidence Presented at the Fatico Hearing

At the hearing the Government offered the testimony of one witness, FBI Special Agent Christopher McKeogh, and presented eight exhibits, all of which were received into evidence. The

4

Court found Agent McKeogh's testimony to be credible. Osman also testified; however, the Court did not find his testimony to be credible, as is discussed in more detail below.

The testimony at the hearing did convince this Court by a preponderance of the evidence that, over the past four months, (1) Osman solicited another inmate at the MDC (where he is currently incarcerated awaiting sentencing) -- who Osman believed was soon to be released -- to collect an extortionate loan from the Batcas; (2) Osman solicited the same MDC inmate to find and kill several people who had participated in the investigation of Osman and Mustafa, including several FBI agents, Assistant United States Attorneys ("AUSAs"), and certain Court personnel; (3) Osman took steps to have individuals outside of jail investigate the targets noted above -- namely various FBI agents and AUSAs -- and to gather personal information about these targets, including home addresses, family members, and photographs; and (4) Osman communicated threats against the Court and the Government in writing directly to this Court and to others.

Specifically, Agent McKeogh testified that he became involved in the investigation of Osman when his office was contacted in April 2007 by Leonard F. Joy, Esq., who is the "head of Legal Aid" for the Southern District of New York. (Tr. 6-7.) Mr. Joy contacted the FBI because he was representing a

5

man named Michael Lair, who was in prison for mail and wire fraud. (Tr. 7-8.)  According to Agent McKeogh, Mr. Joy informed the FBI that his client had written numerous letters on behalf of Osman and that those letters related to "threats against FBI agents, and Assistant U.S. Attorneys." (Tr. 7.)

Following this conversation, the FBI conducted three meetings with Mr. Joy and Mr. Lair. (Tr. 8.)  Mr. Lair provided the Government at those meetings with certain handwritten documents drafted by both Osman and Mr. Lair. (Tr. 10.)  Mr. Lair informed the FBI "that [Osman] sought Mr. Lair's help to author several -- several documents relating to the collection of a debt as well as once that debt was collected, to follow through on threats to kill several FBI agents and Assistant U.S. Attorneys." (Tr. 9.)  Mr. Lair also informed the FBI that "[Osman] asked Mr. Lair to collect the debt that was owed to [Osman] and to use that money to then go and kill the various persons." (Tr. 9.)  At the Fatico Hearing the Government presented evidence of a document written by Osman and signed by both Osman and Mr. Lair, entitled "Assignment of Claim," which, according to Agent McKeogh, Mr. Lair understood to be "a statement saying that the debt was owed to Mr. Lair from which he would collect it and follow through with the various killings." (Tr. 33; Ex. 5.)

Also among the documents the FBI received from Mr. Joy was

6

a page of paper on which Osman wrote a series of names,
including "Muhammed, SSA John Campanella, SA Agent Melvin
Bailey, SA McKeever, and then the words white crime and then the
word Linder," (Tr. 12-13; Ex. 1), which names included witnesses
from the trial and those Osman believed to have been involved in
the investigation related to his conviction.  According to Agent
McKeogh, Mr. Lair informed the FBI that those names were written
by Osman. (Tr. 13.)  Also on that page were the words "kill,"
"yes," and "no," as well as a series of circles and arrows. (Tr.
13; Ex. 1.)  According to Agent McKeogh, Mr. Lair wrote those
words and made those markings "in clarification as to what the
defendant advised to him as far as who he wanted to kill and who
he didn't, and Mr. Lair offered his advice as far as
feasibility, who it would be easier to kill." (Tr. 13, 15-16.)

     As part of that same document was a page on which Mr. Lair
wrote "Osman, we need to be clear, there will be no coming back
from this! Write an exact description of the people you want to
put down." (Ex. 1; see also Tr. 20.)  Below that on the page is
a list of names written by Osman. (Tr. 20-25; Ex. 1.)  Next to
those names are pluses and minuses as well as some descriptions
of the physical appearances of the people listed, written by Mr.
Lair "as per the defendant, as he described them." (Tr. 21-23;
Ex. 1.)  According to Agent McKeogh, Mr. Lair informed the FBI
that Osman provided him with this list, but that the two men

7

then further discussed their plan, and "Mr. Lair took the paper, and the defendant described how these different persons looked." (Tr. 21-22; Ex. 1.)  Agent McKeogh further noted to the Court that, at the time these descriptions were written, Osman had met or seen all of the individuals described on this page, however, Mr. Lair had never met or seen any of them, and that the physical descriptions were generally accurate. (Tr. 22; Ex. 1.) The names on the list included FBI Agents and AUSAs who had worked on Osman's case and some of whom had testified at Osman's trial, as well as Osman's attorneys, the "Case Court Reporter Office" and the "Forensic Test Company." (Ex. 1.)  Also listed were the names of the Batcas as well as their address and additional information about their family. (Ex. 1; Tr. 24-25.)

Agent McKeogh also testified that he obtained documents related to his investigation of Osman though means other than Mr. Lair, including through a mail cover imposed at the Metropolitan Detention Center ("MDC"), where Osman was in prison at the time of this investigation. (Tr. 10, 25-26.).  That mail cover was set up pursuant to a subpoena. (Tr. 26.)  Through documents obtained by this mail cover, the Government showed, among other things, requests by Osman to people outside of the MDC for information regarding certain FBI Agents and AUSAs who had worked on his case, and some of whom had testified against him at trial. (See Ex. 3; Ex. 4.)  Specifically, in a letter

from Osman to a man named Kenneth Gendron, who had been a fellow
inmate of Osman's at the Metropolitan Correctional Center
("MCC"), Osman requested that Mr. Gendron get addresses and
pictures for Osman of FBI Agents and AUSAs, including those
names listed on the document described above, whom Osman
believed "tampere[d] with my case". (Ex. 3; Tr. 28-29.)  Also
received from the mail cover at the MDC was a letter from Osman
to a George DeLuca, with a request that Mr. Deluca call a
"detective friend" of his and "order up some work for me." (Ex.
4; Tr. 29-31.)  Osman then noted that the work is "not
complicated but the results are sensitive," and asks Mr. DeLuca
to "save them for a friend of mine, Mike."  Osman then requested
"a full description of including pictures, addresses, cars,
hangouts for" a list of people including those same FBI Agents
and AUSAs mentioned in the other documents. (Ex. 4; Tr. 31.)

    In other exhibits introduced at the Fatico Hearing the
Court was provided evidence of more direct threats by Osman.  In
a letter dated April 25, 2007, to a Ms. Linda Gonzales,
Custodian of Records for Washington Mutual Bank, Osman wrote
that "Ms. Campanella and Miss Rocha forged documents and put me
in jail falsely. I will punish them soon." (Ex. 2.)  This letter
was received through the mail cover at the MDC.  In a letter to

the Court[2] dated May 2, 2007, Osman wrote "I have friends now who are going to get information on all of you and get even for me. May 13 is coming soon." (Ex. 6.) Also received by the Court and copied to the Government is a collection of documents including a hand-written "SWORN DECLARATION of OSMAN OZSUSAMLAR." (Ex. 7.) In the "sworn declaration," Osman writes that he has "a friend already out who will help me get even with [the "liar FBI and US Attorneys"] that tamper the evidence and leave me in jail." (Ex. 7.) He also writes that "Miss Rocha and Mr. Southwell, Ms. McKeeer and Mr. Bailey - especially Mr. Campanella are liars who will be gone soon." (Ex. 7.) All these people are the FBI Agents and AUSAs mentioned in his other letters. Also in that packet is a letter to Osman's attorney, which seems to have been a cover letter to the sworn declaration. There Osman writes "Attached to the Court filed motion are my statements, I've written over the last year. I know this is suicide, but them first! They have until May 13, 2007." (Ex. 7.)

Osman's primary defense to this evidence was that he did not actually understand the things that Mr. Lair was writing, because Osman "copied those letters after [Mr. Lair] did the drafts." (Tr. 42.) Osman claimed that all of the threatening

---

[2] The Government received a copy of this letter from the Court, as this letter was originally sent directly to the Court, prompting the Court to involve the U.S. Marshals Service, as discussed above. Because the letter indicated that it was to be copied to Ms. Rocah at the United States Attorneys Office, the Court forwarded a copy to her there.

10

language in his letters was written by Mr. Lair, and that Osman did not understand it due to his limited "English capability." (See Tr. 43-44; 48-49.) In his own testimony, Osman attempted to explain the various threatening statements made in the documents presented by the Government by repeatedly claiming that he simply did not understand what Mr. Lair meant by many of the things he told Osman to include in these letters. (See, e.g., Tr. 76, 77-78.) Osman stated generally that "[t]he only reason I trusted him to draft my letter is because I saw him working in the library as a clerk and I knew of his language skills and his understanding of the legal issues, so I totally trusted him, and I didn't know exactly what every word meant or how they would be interpreted." (Tr. 79.)

During his cross-examination of Agent McKeogh, Osman asked his standby counsel to ask Agent McKeogh about a person named Andren Cairne; Agent McKeogh had not heard of that person. (Tr. 60.) However, Osman later testified that Andren Cairne is a woman named Andrea, who was Mr. Lair's girlfriend. (Tr. 88-89.) Osman testified that he never called her or contacted her, and that he did not write her any letters. (Tr. 88-89.) The Government, then, on rebuttal, elicited testimony to the contrary and also presented the Court with a copy of a letter written to Andrea by Osman. (Tr. 89; Ex. 8.) That letter contains a paragraph that reads as follows:

11

> Go to Judge Leisure Court and get pictures
> of him and his staff. Look for ways to
> follow each of them after work. Get hang
> outs, and get phone numbers too - we want
> records. Now, this is all very illegal and
> against the law so be very careful not to
> get. Go after pictures of them all in bad
> positions too - Jena - Judge Leisure, Ms.
> Rocha - all of them.  Let Mike know how you
> are doing and we'll take care of them when
> Mike gets out of prison - soon.

(Ex. 8; Tr. 90-92.)  Again, Osman claimed that Mr. Lair wrote

that letter and Osman merely copied the draft but did not

understand what he was writing. (Tr. 90-91.)  Osman did,

however, testify that he "understood the word of, of course, go,

Judge Leisure, court pictures," but that he did not understand

"the whole concept of it," (Tr. 91), a contention this Court

simply does not believe.  Osman did testify that he understood

what the word "illegal" meant. (Tr. 91.)

## DISCUSSION

### I.  Enhancements to a Guidelines Recommended Sentence

Under section 6A1.3 of the Federal Sentencing Guidelines,

"[w]hen any factor important to the sentencing determination is

reasonably in dispute, the parties shall be given an adequate

opportunity to present information to the court regarding that

factor." In providing the parties with such an opportunity, "[a]

district court has broad discretion as to what types of

procedure are needed at a sentencing proceeding for

determination of relevant disputed facts." United States v.

Duverge Perez, 295 F.3d 249, 254 (2d Cir. 2002); United States
v. Berndt, 127 F.3d 251 (2d Cir. 1997); United States v. Fatico,
579 F.2d 707, 711-14 (2d Cir. 1978).[3]

In addition, the Supreme Court and the Second Circuit have
made clear "that the right of confrontation does not apply to
the sentencing context and does not prohibit the consideration
of hearsay testimony in sentencing proceedings." United States
v. Martinez, 413 F.3d 239, 242-43 (2d Cir. 2005) (citing cases).

II.   Enhancement is Appropriate in this Case

A.   Questions of Credibility

As an initial matter, the Court simply does not believe
Osman's testimony that his English is so poor that he was unable
to understand the nature of what he was doing.  Indeed, he
admitted that he knew what the word "illegal" meant, and still
proceeded to write a document asking someone outside the prison
to engage in unlawful activity on his behalf.  In his repeated
communications to the Court, many of which did not involve Mr.
Lair in any way,[4] Osman has written in much the same way he did
in these letters that he claims he doesn't understand.  Indeed,

---

[3] Moreover, the procedure a district court may choose to follow in determining
the facts that may affect a defendant's sentence "lie within the sound
discretion of the sentencing judge." Berndt, 127 F.3d at 257.  All that is
required is "that the court afford the defendant some opportunity to rebut
the Government's allegations." United States v. Slevin, 106 F.3d 1086, 1091
(2d Cir. 1996).

[4] Osman admitted that he had written to the Court while he was in the Special
Housing Unit, also know as the Box, "pretty much with my own English, but the
parts that I was still copying from other letters that I saw." (Tr. 93.)
These letters were composed and written without the involvement of Mr. Lair
in any way.

even when he has written to the Court in Turkish, the translation of the Turkish[5] reads the same as those letters written in English, with inaccurate or incomplete sentences, grammatical errors, and baseless and speculative allegations of a vast conspiracy against Osman by the Government.

Given this general evaluation of the witnesses' credibility, the Court now turns to a discussion of the three arguments the Government sets forth in favor of its recommendation that an enhanced sentence is appropriate.

B.  U.S.S.G. § 3C1.1

The Government first points to Section 3C1.1 of the Guidelines, which provides for a 2-level upward adjustment to a sentence where a "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1.  One of the examples provided in the Guidelines of "covered conduct" is "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G § 3C1.1, Application Note 4(a).

This section has "a clear mens rea requirement that limits its scope to those who 'willfully' obstruct or attempt to

---

[5] Osman wrote a letter in Turkish to Chief Judge Kimba Wood dated May 20, 2007.  Judge Wood had that letter translated, and then returned it to Osman and also forwarded it to this Court along with a letter explaining to Osman that Judge Wood has no jurisdiction over his case.

14

obstruct the administration of justice." <u>United States v. Case</u>,
180 F.3d 464, 467 (2d Cir. 1999) (quoting <u>United States v.
Stroud</u>, 893 F.2d 504, 507 (2d Cir.1990)).  The <u>Stroud</u> Court
specifically held that "the word 'willfully,' as used in section
3C1.1, requires that the defendant consciously act with the
<u>purpose</u> of obstructing justice." <u>Stroud</u>, 893 F.2d at 507.  Thus,
for a sentencing court "to impose a § 3C1.1 obstruction-of-
justice enhancement on a defendant . . . the court must make a
'specific finding of intent.'" <u>United States v. Reed</u>, 49 F.3d
895, 900 (2d Cir.1995) (quoting U.S.S.G. § 3C1.1).

Osman wrote numerous letters to people outside prison in
which he threatened or attempted to threaten the FBI Agents who
had been witnesses at his trial, the AUSAs who had prosecuted
him, and even this Court.  Such conduct is clearly designated by
the Application Notes to the Guidelines as constituting conduct
this section of the Guidelines is meant to punish.

Given the overall context in which these threats were made,
the Court does believe that Osman did have the required mens rea
to support an enhancement under section 3C1.1.  While one reason
for his threats was clearly revenge for the fact that the case
had been brought against him, and because he believed that the
evidence against him had been tampered with, there is also
evidence that Osman's intention in making these threats was in
an effort to disrupt the normal working of the Court, the FBI

15

and the United States Attorney's Office, and also improperly to
delay his sentencing. (See Tr. 72-73, 85.)  Indeed, Osman's
blatant threats to the Court while the Court was still
considering his sentence appear more obviously, in the Court's
mind, intended to obstruct justice.  Moreover, because of the
frequency, seriousness, and threatening nature of the
communications at issue here, the Court also believes this case
involves conduct "'so inherently obstructive of the
administration of justice' that the enhancement should be
applied if the defendant deliberately engaged in that conduct,
regardless of [his] specific purpose." United States v. Khedr,
343 F.3d 96, 102 (2d Cir. 2003).

     Thus the two-level enhancement recommended by this section
is warranted.  The Court declines to determine at this time,
however, if the enhancement to Osman's sentence should be
limited to the two-level adjustment set forth in section 3C1.1
of the Guidelines.  As the Second Circuit has previously held,
"'Obstructing or Impeding the Administration of Justice' can
describe a huge range of conduct, varying from expressing to an
old friend the hope that his memory of long-past events may have
dimmed to, at the other extreme, murdering witnesses." United
States v. Ventura, 146 F.3d 91, 97 (2d Cir. 1998).  Thus, even
though the two-level enhancement imposed pursuant to Section
3C1.1 is to be imposed here, that enhancement "is intended to

apply to 'heartland' instances of obstruction . . . .  Instances
that are "atypical" in that they vary by reason of degree of
seriousness, or frequency of occurrence, from the norm may
justify an upward or downward departure from the normal two-
level adjustment." Id. (internal citations omitted).

It is likely that the seriousness and frequency of Osman's
threatening letters will bring this case outside the "heartland"
of instances of obstruction, as is discussed in more detail
below.  However, Osman will have the opportunity at his
sentencing hearing to convince the Court otherwise.

C.    18 U.S.C. 3553(a)

The Government also recommends that enhancement is
appropriate under Title 18, United States Code, Section 3553(a).
Section 3553(a) provides seven considerations a district court
must take into account when determining a sentence for a
defendant.  One of the considerations that the Government
believes warrants an increased sentence here is Section
3553(a)(1), which requires a sentencing court to consider "the
nature and circumstances of the offense and the history and
characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  This
Section "provides a natural and necessary basis for placing the
actions of an individual defendant in the broader context of the
crime he or she committed." United States v. Wills, 476 F.3d
103, 110 (2d Cir. 2007).  Further, a sentence must reflect the

seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant, and provide the opportunity for rehabilitation.  U.S.S.G. § 3553(a)(2).

The Court agrees with the Government that, throughout the entire post-trial period, Osman has shown himself to have no respect for the law or the Court, the justice system, and to have even less respect for the safety and well-being of others. The evidence presented at the Fatico hearing only serves to reinforce this conclusion to the Court.  Osman has also shown that the sentencing goal of deterrence will be best served by keeping him imprisoned.  The evidence at the Fatico Hearing showed he was attempting to finish the crime he was unable to commit in the initial prosecution of this case, employing a fellow inmate to collect the debt from the Batcas and kill them if necessary.  It further showed that he intended also to have killed the various FBI Agents and AUSAs who had been, or he believed had been, involved in his case. (Tr. 9; Ex. 1-8.) Thus, taking into account the factors set forth in Section 3553(a), an upward enhancement of Osman's sentence is appropriate.

D.   U.S.S.G. §5K2.0

Finally, the Government points to Section 5K2.0 of the

18

Guidelines, which "authorizes district courts to depart in cases that feature aggravating or mitigating circumstances of a kind or degree not adequately taken into consideration by the Commission." See Koon v. U.S. 518 U.S. 81, 94 (1996) (quoting U.S.S.G. § 5K2.0). Because this section of the Guidelines involves situations that are "atypical," the possible departure factors a district court may encounter "cannot, by their very nature, be comprehensively listed and analyzed in advance." U.S.S.G. § 5K2.0; see also Koon, 518 U.S. at 94. Still, the Guidelines "provide[] considerable guidance as to the factors that are apt or not apt to make a case atypical, by listing certain factors as either encouraged or discouraged bases for departure." Koon, 518 U.S. at 94. For example, "disruption of a governmental function is an example of an encouraged upward departure factor." Id. (citing U.S.S.G. § 5K2.7).

The circumstances present here are certainly "atypical." Since the time of his conviction Osman has engaged in activity that has significantly disrupted the function of the Court, the FBI, and the United States Attorney's Office. Osman has inundated this Court with frivolous and lengthy complaints about the outcome of his trial, the performance of his counsel, and has effectively delayed his sentencing through his repeated requests related to his desire to proceed pro se.

Of much greater concern, however, is the fact that Osman

19

sent multiple communications to people outside prison with the
intent of communicating a threatening message and with the
intent of disrupting the governmental function by harming its
agents.  Not only did Osman send a threatening letter directly
to the Court, causing it to involve the U.S. Marshals Service,
see United States v. Harrell, 207 F. Supp. 2d 158, 167 (S.D.N.Y.
2002) (noting that upward departure appropriate would be
appropriate if defendant intended "to communicate a threatening
message designed to be accepted and understood as such by any
specific person or limited audience"), but there is evidence
that Osman was attempting to finish the original crime at issue
by employing a fellow inmate to collect the debt from the Batcas
and kill them if necessary, and also to kill FBI Agents and
AUSAs who had been involved in his case. (Tr. 9; Ex. 1-8.)

Thus, based on all the facts and circumstances, including
the demeanor and testimony of both witnesses at the Fatico
Hearing, as well as the evidence presented, there is no question
that the Government has shown beyond a preponderance of the
evidence that Osman's sentence should be enhanced.

## CONCLUSION

For the foregoing reasons, this Court finds that the Government has established, by a vast preponderance of the evidence, that Osman Ozsusamlar's sentence should be enhanced by two levels pursuant to Section 3C1.1 of the Guidelines, and that his sentence may be further enhanced at the time of sentencing pursuant to Section 5K2.0(a)(2)(B) and based on consideration of the factors in Title 18, United States Code, Setion 3553(a). Osman Ozsusamlar is hereby ordered to appear before this Court on September 18, 2007 at 10:00 a.m. for sentencing.

**SO ORDERED**

New York, New York
August **28**, 2007

_____
U.S.D.J.

21

Copies of this Opinion and Order have been sent to:

Miram E. Rocah, Esq.
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007


Osman Ozsusamlar
#53271-054
MDC BROOKLYN
Metropolitan Detention Center
P.O. BOX 329002
Brooklyn, NY 11232


Frank Rothman, Esq.
Rothman, Schneider, Soloway & Stern, L.L.P.
100 Lafayette Street, Suite 501
New York, NY 10013