USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 12/09/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MUSTAFA OZSUSAMLAR,

                              Defendant.

No. 05-CR-1077-1 (RA)

ORDER

RONNIE ABRAMS, United States District Judge:

On November 15, 2021, the Court received a letter from Mr. Ozsusamlar. Dkt. 195. In the letter, he seeks to correct purported "clerical mistakes and error" from his 2007 sentencing. Of the various federal rules of criminal procedure that Mr. Ozsusamlar cites in the letter, the only arguably applicable ones are Rule 32, Rule 35, Rule 36, and Rule 52(b). The Court considers any potential argument that might flow from each of these rules. *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (courts interpret filings by pro se litigants to "raise the strongest arguments that they suggest").

Mr. Ozsusamlar cites Federal Rule of Civil Procedure 32's requirement that "[b]efore imposing sentence, the court must . . . address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii); *see Hill v. United States*, 368 U.S. 424, 426 (1962) (discussing an earlier version of this rule and explaining that it "requires a district judge before imposing sentence to afford every convicted defendant an opportunity personally to speak in his own behalf"). The sentencing transcript, which the Court attaches to this Order, makes clear that Judge Leisure did so. Sentencing Transcript at 16, 24. Accordingly, any Rule 32 argument Mr. Ozsusamlar raises is unmeritorious.

Federal Rule of Criminal Procedure 35 provides that "[w]ithin 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error." Fed. R. Crim. P. 35(a).  Because far more than 14 days have passed since Mr. Ozsusamlar was sentenced in 2007, any argument under Rule 35 is untimely.

Rule 36 states that "[a]fter giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission." Fed. R. Crim. P. 36.  The Court observes no clerical error in the sentence or any other error in the record.  Finally, Rule 52(b) states that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b).  The Court finds no such plain error here.

Although Mr. Ozsusamlar's letter is largely characterized as a Rule 35 motion—which, again, would be untimely—some of his arguments appear to deviate from that Rule or any other Rule.  Namely, Mr. Ozsusamlar seems to allege that he is currently being held past the end date of the sentence imposed by Judge Leisure.  He asserts that at sentencing, Judge Leisure stated that Mr. Ozsusamlar's sentence would begin to run as of the date of his indictment in that case.  Mr. Ozsusamlar contends that based on this oral ruling, he completed his sentence 30 months ago because he was indicted on October 5, 2005.

The relevant colloquy from the sentencing transcript reads as follows:

MR. SIEGEL: Your Honor, the defendant has a technical question and the defendant would like to know when for computation purposes, when does your sentence begin to run?  Does it run from when the crime occurred, which was sometime in October, September-October 2005, or does it run or commence from a later time?

THE COURT: It may well be that as soon as he was arrested and he was in custody the time started to run.  Maybe the government can tell us.

MS. ROCAH: Obviously this is a calculation that the Bureau of Prisons will do and I suppose if the defendant has objections to their calculations he can raise it then since sitting here now we don't know what it will be.  It's something done by the

> Bureau of Prisons. But my understanding is he was in custody on the previous
> conviction and so I am not sure if he would have received credit yet on this sentence
> but I don't really want to speculate because it's a Bureau of Prison's calculation.

Sentencing Transcript at 43. Although Mr. Ozsusamlar suggests that the sentencing transcript has

been "altered," he gives no legitimate reason for the Court to suspect that this transcript does not

accurately represent what was stated at sentencing. And on the plain face of the transcript, Judge

Leisure did not say that the sentence began to run at indictment or at arrest; he deferred to the

Government on that question, and the Government rightly responded that this determination was

within the province of the Bureau of Prisons. *See, e.g.*, *Cintron v. Warden, F.C.I. Otisville*, 52 F.

Supp. 3d 654, 655 (S.D.N.Y. 2014) ("It is the responsibility of the BOP, rather than the courts to

determine the commencement of a federal sentence and calculate any credit toward that sentence

for time already served."); *United States v. Labeille–Soto*, 163 F.3d 93, 98 (2d Cir. 1998) (same).

Mr. Ozsusamlar gives the Court no reason to infer that the BOP's calculation of his sentence,

including its date of commencement and any calculation of credit, is inaccurate.[1]

    Accordingly, Mr. Ozsusamlar's motion is denied. The Clerk of Court is respectfully

directed to mail a copy of this order to Mr. Ozsusamlar.

    SO ORDERED.

    Dated: December 9, 2021
    New York, New York

_____
Ronnie Abrams
United States District Judge

---

[1] Mr. Ozsusamlar also invokes *United States v. Quintana-Gomez*, 521 F.3d 495 (5th Cir. 2008), in which the Fifth Circuit held that a district judge does not have the "authority to order that its sentence run consecutively to an anticipated but not-yet-imposed federal sentence." *Id.* at 498. But Mr. Ozsusamlar's prior sentence had already been imposed by then-Chief Judge Wood when he was sentenced in the instant case. Sentencing Transcript at 38. Finally, he argues that Judge Leisure erred in stating that the applicable criminal history category was IV, citing to paragraph 68 of his presentence investigation report. But paragraph 68 of the report does assign a criminal history category of IV, *see* Presentence Investigation Report (filed with the Court), a calculation to which Mr. Ozsusamlar did not object at sentencing. *See* Sentencing Transcript at 9-10.

7B8SOZSUSAMLAR

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,


            v.                          05 Cr. 1077


MUSTAFA OZSUSAMLAR,

                  Defendant.

------------------------------x

                                        November 8, 2007
                                        10:15 a.m.

Before:

                  HON. PETER K. LEISURE,

                                        District Judge

                        APPEARANCES

MICHAEL J. GARCIA
      United States Attorney for the
      Southern District of New York
MIRIAM ROCAH,
      Assistant United States Attorney

MARTIN J. SIEGEL, ESQ.
      Standby Attorney for Defendant

INTERPRETERS:  A.J. ELTERMAN
               ASIYE KAY

7B8SOZSUSAMLAR

1        (Case called)

2        THE COURT:  We will swear in the interpreters.

3        (Interpreters sworn – A.J. ELTERMAN and ASIYE KAY)

4        THE COURT:  As I have done in the past with the cases

5   by the father and son, Osman, I have made a summary statement

6   because I think it's helpful to the higher court, and also

7   different issues have been raised by the father and son.  There

8   are some similarities but it's important to keep them separate

9   for considerations at sentencing and other matters that we have

10  had to come up.

11       So I am going to do the same thing here before I hear

12  from the parties.  Although the background of this case has

13  been well covered at numerous post-trial conferences that we

14  have had following the conviction by a jury, I will summarize

15  the events that have led up to today's sentencing.

16       On April 20, 2006 a jury convicted Mustafa Ozsusamlar,

17  who I will refer to as either Mustafa or the defendant in this

18  proceeding, and his son, Osman Ozsusamlar, who I will refer to

19  as Osman, of conspiracy to commit a murder for hire and the

20  substantive crime of murder for hire in violation of 18 U.S.C.

21  Section 1958, and conspiracy to commit extortion in violation

22  of 18 U.S.C. Section 1951.

23       I want to ask the interpreters to tell me if I am

24  moving too quickly.

25       I know the defendant speaks English and occasionally

7B8SOZSUSAMLAR

1    he has responded in English but at the same time he has

2    requested that we have translations and that he have an

3    opportunity to speak in Turkish, as he deems appropriate, or in

4    English, and we will accommodate him.

5              Mr. Siegel, who is standby counsel, has conversed with

6    him in English but he has used the interpreter when he deemed

7    it appropriate.

8              All three counts were charged in a superseding

9    indictment filed on January 4, 2006.  As I said, the defendants

10   are father and son.  Mustafa is the father and Osman is the

11   son.  Mustafa is before the court today for sentencing.

12             The events underlying the charges took place between

13   August 2005 and October 2005.  The case involved a man who owed

14   approximately $283,000 to the two defendants.  Mustafa, while

15   incarcerated at the Metropolitan Correctional Center (the

16   "MCC") pending sentencing following his conviction in a

17   separate case, asked a fellow prisoner -- who was a cooperating

18   witness ("CW") -- if he knew of someone who could collect the

19   debt, by force if necessary, and kill the man, and possibly

20   also his wife, after the debt was collected.  Mustafa offered

21   to pay the killer 10 percent of the money collected.  After the

22   CW informed the government of Mustafa's request, the government

23   arranged for an undercover agent (the "Agent") named "Joe" to

24   pose as a collector/hit man.  The CW provided thee agent's

25   information to Mustafa.

7B8SOZSUSAMLAR

1        Mustafa, via phone, directed Osman to contact the

2   agent.  Osman did so, and arranged a meeting at which the two

3   discussed the details of the scheme.  Some time later, the

4   agent called Osman to tell him that he had collected the debt

5   and carried out the scheme.  Osman and the agent made

6   arrangements to meet, and Osman was arrested when he arrived at

7   the agreed-upon location.  Mustafa was arrested the next

8   morning.  The intended victims were not harmed.

9        Subdivision II.  Post trial activities.

10       Following the verdict, while still represented by his

11  trial counsel, Barry Turner, Esq., Mustafa sent numerous

12  communications directly to the court regarding his

13  representation as well as his concerns about and challenges to

14  the jury verdict.  Based on Mustafa's written requests, the

15  court held conferences on August 26, 2006, March 20, 2007,

16  April 4, 2007, and June 5, 2007 to discuss his concerns.  At

17  the April 4, 2007 conference, the court granted Mustafa's

18  request to proceed pro se.  Martin J. Siegel, Esq., who is here

19  today, from the Criminal Justice Act panel currently serves as

20  Mustafa's standby counsel.

21       On June 5, 2007, the court granted Mustafa's request

22  for a hearing in order to place on the record evidence

23  regarding certain of Mustafa's pro se motions, including a

24  request for a judgment of acquittal pursuant to Rule 29 of the

25  Federal Rules of Criminal procedure, for a new trial pursuant

7B8SOZSUSAMLAR

1    to Rule 33 of the Federal Rules of Criminal procedure, and more

2    dismissal of the charges against him pursuant to Rule 12(b)(2)

3    of the Federal Rules of Criminal procedure.  That hearing was

4    conducted on August 14, 2007.  By opinion and order dated

5    September 20, 2007, Mustafa's motions were denied.

6          The Pre-Sentence Report ("PSR") for Mustafa was

7    prepared on January 23, 2007 and revised on February 21, 2007.

8    The revision reflected that on January 29, 2007, Mustafa was

9    sentenced to 235 months imprisonment by Chief Judge Kimba M.

10   Wood in a separate criminal case.  Through his standby counsel,

11   Mustafa submitted his sentencing memorandum on October 9, 2007.

12   The government briefly responded on October 10, 2007 in order

13   to clarify the record as it related to some of Mustafa's

14   objections.  Mustafa submitted another sentencing-related

15   letter dated October 19, 2007, to which the government did not

16   respond.

17         Sub-heading III.  Sentencing Post-Booker.

18         I will now turn to the sentencing of the defendant

19   based on the submissions made by the parties.  First, I will

20   discuss the factors that I am required to consider in

21   determining your sentence.

22         As a result of two opinions issued in 2005, the

23   sentencing guidelines are no longer mandatory.  United States

24   v. Booker, 534 U.S. 220, 243-44 (2005); see United States v.

25   Fernandez, 443 F.3d 19, 26 (2d Cir. 2006).  Today, "pursuant to

7B8SOZSUSAMLAR

1    the remedy opinion, the now advisory guidelines are to be

2    considered, together with the other factors set forth in 18

3    U.S.C. Section 3553(a), by judges fashioning sentences."

4    Fernandez, 443 F.3d at 26.   The Second Circuit has articulated

5    the following steps for a sentencing court to follow:   "A

6    sentence will satisfy the requirements of Booker and the Sixth

7    Amendment if the sentencing judge (1) calculates the relevant

8    guidelines range, including any applicable departure under the

9    guidelines system; (2) considers the calculated guidelines

10   range, along with the other Section 3553(a) factors and (3)

11   imposes a reasonable sentence."   Id.

12        Subdivision A, calculation of the guidelines range.

13        In United States v. Crosby, 397 F.3d 103, 112 (2d Cir.

14   2005), the Second Circuit instructed sentencing courts that

15   "the applicable guidelines range is normally to be determined

16   in the same manner as before Booker/Fanfan."   Thus, as was the

17   case before Booker, facts relied on in sentencing need only be

18   proven by a preponderance of the evidence.   See United States

19   v. Vaughn, 430 F.3d 518, 525 (2d Cir. 2005) (Sotomayor, J.)

20   (noting that in the Second Circuit "judicial authority to find

21   facts relevant to sentencing by a preponderance of the evidence

22   survives Booker," and finding that "district courts remain

23   statutorily obliged to consider the guidelines in the same

24   manner as before Booker") (quotations and citations omitted).

25        Subdivision B.   Consideration of the guidelines range

7B8SOZSUSAMLAR

1    and the Section 3553(a) factors.

2         While usually "a guidelines sentence will fall

3    comfortably within the broad range of sentences that would be

4    reasonable in the particular circumstances," the Second

5    Circuit -- in accord with other courts of appeals -- has

6    "declined to establish any presumption, rebuttable or

7    otherwise, that a guidelines sentence is reasonable."

8    Fernandez, 443 F.3d at 27.  Consequently, a district court is

9    required to "consider" the advisory guidelines range, an

10   inquiry that is impossible to define and, thus, better left to

11   the discretion of the sentencing judge.  Crosby, 397 F.3d at

12   113 ("we think it more consonant with the day-to-day role of

13   district judges in imposing sentences and the episodic role of

14   appellate judges in reviewing sentences, especially under the

15   new applicable standard of reasonableness, to permit the

16   concept of consideration in the context of the applicable

17   guidelines range to evolve as district judges faithfully

18   perform their statutory duties.").

19        The Second Circuit recently held that such

20   consideration does not include a "requirement that a sentencing

21   judge precisely identify either the factors set forth in

22   Section 3553(a) or specific arguments bearing on the

23   implementation of those factors in order to comply with its

24   duty to consider all the Section 3553(a) factors along with the

25   applicable guidelines range."  Fernandez, 443 F.3d at 29;

7B8SOZSUSAMLAR

accord United States v. Flemming, 397 F.3d 95, 100 (2d Cir.

2005) (Newman, J.) ("as long as the judge is aware of both the

statutory requirements and the sentencing range or ranges that

are arguably applicable, and nothing in the record indicates

misunderstanding about such materials or misperception about

their relevance, we will accept that the requisite

consideration has occurred.").

        While a sentencing judge is not required to articulate

its consideration of each and every Section 3553(a) factor, the

Second Circuit has made clear that it "continues to encourage

sentencing judges to facilitate our review by providing

complete and detailed explanations regarding their sentencing

decisions."   Fernandez, 443 F.3d at 31 n.8; Crosby, 397 F.3d

at 116 ("district judges will, of course, appreciate that

whatever they say or write in explaining their reasons for

electing to impose a guidelines sentence or for deciding to

impose a non-guidelines sentence will significantly aid this

court in performing its duty to review the sentence for

reasonableness.").

        The Section 3553(a) factors are:

        1.  The nature and circumstances of the offense and

the history and characteristics of the defendant;

        2.  The need for the sentence imposed to reflect the

seriousness of the offense, to promote respect for the law, to

provide just punishment for the offense, to afford adequate

7B8SOZSUSAMLAR

deterrence to criminal conduct, to protect the public from

further crimes of the defendant, and to provide the defendant

with needed educational or vocational training, medical care,

or other correctional treatment in the most effective manner;

3.   The kinds of sentences available;

4.   The kind of sentence and the sentencing range

provided for by the sentencing guidelines;

5.   Any pertinent policy statement issued by the

Sentencing Commission;

6.   The need to avoid unwarranted sentence disparities

among defendants with similar records who have been found

guilty of similar conduct; and,

7.   The need to provide restitution to any victims of

the offense.

18 U.S.C. Section 3553(a).

Subdivision paragraph IV.  The parties' proposals to

the court.

I will now address the PSR and Mustafa's October 9 and

October 19 sentencing memoranda.  As I stated earlier, the

government did not submit a sentencing memorandum, but only

responded to a few of Mustafa's objections in order to clarify

the record.

Subdivision A.  Probation.

Probation determined that Mustafa's criminal history

category was IV and calculated his total offense level to be

7B8SOZSUSAMLAR

1   33.

2            Mustafa's criminal history category was determined by

3   the sum of his criminal history points.  Under U.S.S.G. Section

4   4A1.1A, any prior sentence exceeding one year and one month

5   equals 3 points.  Mustafa had two such sentences, one in 1995

6   and the other in 2007, yielding 6 criminal history points.

7   Additionally, under U.S.S.G. Section 4A1.1D, 2 points were

8   added because Mustafa committed the instant offense while

9   imprisoned.  Accordingly, Mustafa had a total of 8 criminal

10  history points, placing him in criminal history category IV.

11           Probation's calculation of the offense level of 33 was

12  based on their grouping of the counts into two groups.

13  Specifically, pursuant to Section 3D1.2 of the guidelines,

14  which allows for the grouping of counts with substantially the

15  same harm, Counts 1 and 2 -- conspiracy to commit murder for

16  hire and murder for hire in violation of 18 U.S.C. 1958 -- were

17  grouped together into "Group One."  The base offense level for

18  these counts was calculated based on Section 2E1.4 of the

19  guidelines, which provides for a base offense level of 32.

20           The remaining Count 3 (conspiracy to commit extortion

21  in violation of 18 U.S.C. 951) is its own group, "Group Two."

22  The base offense level for this count was calculated based on

23  U.S.S.G. Section 2B3.2, which provides for a base offense level

24  of 18.  While there were no adjustments recommended for Group

25  One, leaving the total offense level at 32, probation

7B8SOZSUSAMLAR

recommended 3 enhancements to the Group Two base offense level

for specific offense characteristics:

 1.  An increase by two levels because the offense

involved an expressed or implied threat of death, bodily

injury, or kidnapping.  U.S.S.G. Section 2B3.2B1;

 2.  An increase of 3 levels because the amount

demanded was more than $250,000 but less than $800,000.

U.S.S.G. Section 2B3.1B7D; and,

 3.  An increase of three levels because the offense

involved preparation to carry out a threat of death.  U.S.S.G.

Section 2B3.2(3)(B)(I).

 Accordingly, the total offense level for Group Two is

26.  Probation then determined the combined offense level

pursuant to U.S.S.G. Section 3D1.4.  According to the

calculation, Group One counts as one unit, and Group Two counts

as one half unit.  This results in a combined offense level of

33.

 The resulting guidelines range for criminal history

category IV and an offense level of 33 is 188-235 months.

Probation recommends a sentence of 188 months imprisonment.

Probation also recommends that this sentence be followed by 3

years of supervised release.  Notably, probation states that,

pursuant to Section 5G1.3 of the guidelines, this sentence must

run consecutively to the 235 month sentence imposed by Chief

Judge Wood in United States v. Ozoglu et al., 02 Cr. 763.

7B8SOZSUSAMLAR

1    Finally, probation recommends waiving the fine because Mustafa

2    is subject to a $20,000 fine imposed by Chief Judge Wood.

3    Probation believes this sentenced adequately reflects the

4    serious nature of the defendant's offense, and would

5    sufficiently further the criminal justice system's objectives

6    of punishment and deterrence.

7                Subdivision B.  Mustafa.

8                Mustafa submitted a memorandum to the court dated

9    October 9, 2007, listing 26 objections to the PSR.  As the

10   government notes in its response, the vast majority of

11   Mustafa's submission consists of "attempts to reargue the trial

12   evidence."   Other objections have no bearing on Mustafa's

13   sentencing.  For the record, the court notes that paragraph 9

14   of the PSR should be clarified to state that, after a jury

15   conviction on a variety of charges, District Judge Debevoise

16   entered a judgment of acquittal on those charges related to

17   hostage-taking.  Further, that same paragraph should state that

18   Mustafa's 1995 conviction actually took place in May, and not

19   in September.  Paragraph 64 of the PSR should read that Mustafa

20   was convicted on May 14, 2004.  Mustafa does make two arguments

21   related to his sentence.  First, he asks the court to "sentence

22   the defendant to a term that reflects that no one was actually

23   threatened, harmed or injured."   (Defendant's 10/9 memo at 4.)

24   Second, he urges the court to impose a concurrent sentence to

25   Chief Judge Wood's 235-month sentence.  (Id.)

7B8SOZSUSAMLAR

1

         Mustafa's second submission to the court, dated

October 19, 2007, rehashes arguments he has already raised

following trial.  Namely, Mustafa argues that evidence used in

his trial was fabricated, altered and hidden, witnesses were

hidden and tainted by the government, and transcripts from the

trial were altered.  (Defendant's 10/19 memo at 1-4.)  This

court generally addressed these issues in an opinion and order

on September 20, 2007, finding Mustafa's claims to be wholly

without merit.  Of course, Mustafa may argue these points in an

appeal to the Second Circuit Court of Appeals, but they have

already been disposed of here, and are thus not pertinent to

today's sentencing.  Mustafa's October 19 letter does raise two

points related to sentencing.  First, defendant requests a

departure for giving substantial assistance to the authorities.

He states that he "provided the government with evidence that

helped in arresting and convicting people involved in crime  .

. . . " (Id. at 5.)  Second, defendant asks the court to

consider his community service.  Specifically, Mustafa leads

prayer services for fellow inmates, donated funds to the

Turkish education department to construct a school, and served

as mayor of a town in Turkey from 1970 to 1974.  (Id..)

         I am going to take a ten-minute recess at this point

and then I am going to hear from the parties when we come back

with anything that they wish to add.

         We will take a ten-minute recess.

7B8SOZSUSAMLAR

1        (Recess)

2        THE COURT:  Another advantage of a recess before

3    continuing, it allows me to review my notes and I do see an

4    error I made where I indicated that the sentence before Chief

5    Judge Wood consisted of a fine of -- and I said $200,000 and it

6    was $20,000.  So I make that correction for the record.  I

7    think probably the reporter picked it up when I was going

8    through it.

9        Now, I think it's a good time to hear from both sides

10    before I actually calculate the sentence with regard to this

11    guidelines range.  So before I make that determination, I might

12    ask standby counsel first whether he has anything he wishes to

13    add.

14        MR. SIEGEL:  Good morning, your Honor.

15        If it please the court, I think the defendant will be

16    addressing court in detail as far as certain issues.  The only

17    thing I would like to raise is, number one, that you recommend

18    to the Bureau of Prisons that he be confined to a facility as

19    close to New York as possible and, in addition, if he can be in

20    the same facility as his son is.  That would be one

21    recommendation.

22        Just on the issue of the concurrent versus the

23    consecutive, the Pre-Sentence Report makes reference for

24    authority to a guidelines provision.  However, I do not believe

25    that such a requirement is found in the statute, such as in

7B8SOZSUSAMLAR

1    924(c), a violation would require by statute a mandatory

2    consecutive sentence.  I think on the offense here calling for

3    a consecutive sentence, they make reference to a guidelines

4    statute and as the court is aware the guidelines are advisory

5    versus being mandatory, such as the statutory provision.  So my

6    only comments would be what I submitted to the court is

7    whatever sentence the court imposes and I think the Probation

8    Department recommended on two counts 120 months to run

9    concurrent with a sentence of Count 3 of 188 months.  The only

10   thing I would ask is that that sentence run concurrent with

11   that of Judge Wood's.

12        And the defendant would like to address the court,

13   your Honor.

14        THE COURT:  Let's me give the government a chance to

15   consider what you are saying.  They might want to comment on

16   it.

17        I have given consideration prior to our coming down

18   here today with regard to what you are raising and why don't we

19   see how I handle it, and then I will hear from both sides at

20   this that point.

21        MR. SIEGEL:  And just for the record, I am referring

22   to page 21 of the report, the second paragraph, where it reads

23   pursuant to Section 5G1.3A the instant offense must run

24   consecutive to the undischarged term of imprisonment, and again

25   5G1 is not a statute but it's a guidelines provision.

7B8SOZSUSAMLAR

1          THE COURT:  Well, the government can be considering

2     your comments and hear what I have to say when I have further

3     dialogue on it.

4          Now I will hear from Mustafa before I impose sentence.

5          Any comment?

6          THE DEFENDANT:  Yes, your Honor.  I have eternal

7     unlimited respect to the honorable judge in this court.  Your

8     Honor, whether your judgment will be in my favor or against me,

9     I believe that your decision will reflect the human rights

10    facts of this country and given the background, your own

11    conscientiousness and your long years of service as a judge,

12    and that you will be doing this with a peace of mind, and I

13    trust that.  Your Honor had already mentioned that I should

14    bring forth certain statements that might have impact in the

15    future in my case, for the future, so I would like to in

16    particular mention something pertaining to the CDs that you had

17    pointed out that I can do that.

18         If possible I would like to propose that as attorney

19    for the appeals, attorney Elizabeth Fink, should be appointed.

20         THE COURT:  The name is Finkelstein, is that correct?

21         MR. SIEGEL:  It's Elizabeth Fink, your Honor.

22         THE DEFENDANT:  The address is 13 Gaye Street, New

23    York, New York 10014.

24         THE COURT:  Is she on the CJA panel?

25         MR. SIEGEL:  I think Ms. Fink is on the panel, your

7B8SOZSUSAMLAR

1    Honor.

2              THE COURT:  I will be hearing from the government not

3    at this moment on it but the government will comment at any

4    time they wish to with regard to any of these matters that are

5    being raised at this point or after I impose the sentence.  So

6    I will leave it up to the government.  Some of these matters

7    are to be considered after the sentence, I suppose.

8              THE DEFENDANT:  Your Honor, my second request, if

9    possible I would like to have detectives assigned to do some

10   research and investigation pertaining to my case.

11             My third request is that after my sentence has been

12   spoken that my sentence be served, that I serve my sentence at

13   least 5 to 6 months in the prison that I am presently in and

14   the reason for this is, your Honor, is because I have four

15   separate cases, two of which are in the Southern District and

16   two of which are civil cases and in order to pursue them I need

17   to be close to this area.

18             THE COURT:  I can make recommendations to the Bureau

19   of Prisons and they often follow my recommendations, but the

20   final decision with regard to where you are placed is the

21   Bureau of Prison's decision and they will certainly extend

22   every courtesy to the court, but they make the final decision.

23   But the government may have something to add too.

24             Please continue.

25             THE DEFENDANT:  I can see that your Honor has already

1   mentioned the points that I wanted to mention here.  The sealed

2   record of the CD dated September 18, 2005 was mailed to me by

3   the judge two weeks ago.  This CD was shown to the jury as

4   Government Exhibit 21 as a sealed evidence, a sealed exhibit.

5           THE COURT:  In which case are you talking about it was

6   shown to the jury, is it my case or someone else?

7           THE DEFENDANT:  This case, your Honor.

8           THE COURT:  You are saying that Government Exhibit 21

9   used in the case before me was shown to the jury?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And what is your point?  What are you

12  requesting me to do about that?

13          THE DEFENDANT:  It is evident here that this sealed

14  document was not taken into seal and for 160 days it was under

15  seal.

16          THE COURT:  Do you understand what his grievance is?

17  I ask the government counsel.

18          MS. ROCAH:  No, your Honor, I don't.

19          THE COURT:  I don't understand.

20          MR. SIEGEL:  Your Honor, I think there was an issue

21  when a CD was taken, and I think his position is that one of

22  the CDs that was used at trial I think the defendant contends

23  that there was a hiatus of 160 days from when the recording was

24  made to when it was placed under seal.

25          Is that correct?

7B8SOZSUSAMLAR

1          THE DEFENDANT:  Yes.

2          MR. SIEGEL:  And I think the defendant's position,

3     your Honor, is that during that 160-day period that the CD was

4     tampered with and therefore it was corrupted.

5          THE COURT:  This goes to tampering, an issue which he

6     has already raised.

7          Does the government have anything to add to that?  Do

8     you need more time to consider it?

9          MS. ROCAH:  No, your Honor, I will address it.

10         THE COURT:  All right.  The government will respond

11    before we leave here today.

12         THE DEFENDANT:  The judge permitted $4,000 to be used

13    for the forensic testing of the CD.  There was an amount of

14    $3200 paid to the effect that the forensic test was done but

15    there is no report that we have in our hand and here it doesn't

16    show anywhere that it went to forensic testing.  Why was this

17    money paid?  This is the government's duty to find out if

18    somebody is stealing this money.

19         THE COURT:  Does the government understand what his

20    grievance is?

21         MS. ROCAH:  Your Honor, I think the defendant is

22    referring to this envelope that the CD was contained in, the

23    FBI envelope in which the CD had been contained which has some

24    dates on it.  Basically every time the CD is taken out of the

25    sealed envelope it's logged in and out by the agent taking it

7B8SOZSUSAMLAR

1    in and out and he seems to be referring to the fact that there

2    is no indication on that FBI envelope about the test or the CD

3    being sent for forensic testing.  That is the best I can

4    understand what he is saying.

5         I don't think there would be any indication on that

6    envelope of a CD being sent to forensic testing since it's not

7    the government who sent it.  It was something requested by the

8    defendant and we never had anything to do with any kind of

9    forensic testing.  We never sent anything for forensic testing.

10   We never got a report.  It's just not something the government

11   is involved with.

12        THE COURT:  It's something that should have been

13   raised during the trial rather than sentencing.

14        MS. ROCAH:  Yes.

15        THE COURT:  So he is raising it today but, in any

16   event, as I have said before he can raise on appeal these

17   issues, but I have done the best I can to explain to him.  He

18   doesn't seem to listen to his lawyers, which has been part of

19   of his problem, and he continues to be taking positions which

20   don't necessarily make sense.  But, in any event, we must move

21   ahead.

22        What else have you got to say here today?

23        THE DEFENDANT:  This is not a position or some kind of

24   opinion that I am mentioning but I received it two weeks

25   before.

7B8SOZSUSAMLAR

1          THE COURT:  You should have taken it up with your

2     lawyer.  You are now your own lawyer, so I am hearing you but I

3     think you are wasting time.

4          Let's move ahead.

5          What else have you got to raise here today?

6          THE DEFENDANT:  There is a certain point I would like

7     to mention.

8          At the hearing on August 14 there was a T-Mobile

9     telephone bill that I showed here, 973, 650, and also a

10    telephone with a number 5806.  I showed this telephone bill

11    here to the court but when I went to the Marshals Service it

12    was taken away from my file.  Who took it, I don't know.

13         Another point I would like to make, your Honor, is

14    that the address of 349 12th Avenue in Paterson, New Jersey, my

15    son Osman lives at his home on the third floor -- I am sorry,

16    at the same address with Osman, my other son, Ramazan lives on

17    the third floor.  The garage door to this home was broken and

18    there was a search undertaken, performed there.  Two weeks

19    later, two weeks after that the door to the basement was broken

20    and the inside was searched.  Again, two weeks later again the

21    third floor door was opened and someone went inside.  Only

22    written documents, family photographs and CDs were taken.  And

23    the camera was removed, taken away, removing it out of its

24    case, and the door was locked again and the people left.

25         When a thief comes into someone's home they steal

7B8SOZSUSAMLAR

articles, goods, they don't steal written documents and they

don't take a camera removing it from its case.  They take it

together with the case.

        This is something that was done by Campanella and the

staff working at his office.  We think, we guess, that this was

done by them in order to eliminate evidence.  At the MDC, the

prison where I serve my sentence, my CDs were eliminated or

destroyed, disappeared, and the CDs of my son were taken away

and exchanged with other ones, replaced with other ones.

        The fact that these things have been done, and apart

from that my son Ramazan is under pressure by people working at

Campanella's office.  A person like my son may have committed

an offense, possibly, but New Jersey is a different state.

There is a judge, a prosecutor, police and FBI there.  Instead

of all these authorities getting involved, why is Campanella's

office getting involved and pursuing this?  Why do they feel

the need to question, interrogate somebody who has his full

civil liberties under pressure?

        Where are the human rights?  Where is democracy?

Where is liberty?

        THE COURT:  Let me hear from the government.  I don't

know whether he is raising again matters he has already raised

or whether these are the first time that he has voiced these

additional items.  We know we have been dealing with him over

the period of time and that is the reason the sentencing has

7B8SOZSUSAMLAR

1    been delayed as long as it has been and I held conferences, as

2    I indicated, at the beginning of these proceedings to address

3    his concerns and we tried to keep up with his unending

4    complaints and criticisms.

5         Are these being raised for the first time today as far

6    as the government is concerned?

7         MR. SIEGEL:  Your Honor, if I can just relate what the

8    defendant's position is because he told me about this the other

9    day when I met with him at the MDC.  Apparently he feels there

10   is a major conspiracy going on which is being directed by

11   Special Agent Jack Campanella against the defendant and his

12   family and his position is that Special Agent Campanella is

13   directing this group of people to go in, search his home on

14   other occasions, to basically try to coerce his son into

15   violating the law.  He also feels Special Agent Campanella had

16   advised the marshals to remove certain documents from his file

17   after the last court appearance because they felt or Special

18   Agent Campanella felt these documents may have been

19   advantageous to his case.  And while he was in the marshals'

20   lock-up apparently Special Agent Campanella or Ms. Rocah or

21   someone else from the prosecutorial team directed the marshals

22   to remove items from his legal file.

23        I think that is what the defendant is alleging, your

24   Honor.

25        THE COURT:  Let me hear from the government.

7B8SOZSUSAMLAR

1          MS. ROCAH:  Your Honor, I hesitate to say that these

2     have never been raised before only because the defendant has

3     previously raised just about every conceivable claim he could

4     raise.  So I think in some form or another he has raised these

5     before and your Honor has I think basically said that there is

6     no evidence in the record anywhere of any of these

7     unsubstantiated claims.

8          To the extent they haven't been raised before

9     obviously this is not the appropriate time to raise them but I

10    think more importantly in the multitude of hearings and

11    conferences and arguments and of course from the trial itself,

12    there is obviously no evidence in the record of any of these

13    paranoid claims on the defendant's part.  And they are totally

14    extraneous to the issues related to trial and his conviction

15    and his sentencing.

16         THE COURT:  All right.

17         Is there anything else you wish to raise today?

18         Maybe you should listen to your lawyer as to what is

19    appropriate to be raising at your sentencing and what are

20    matters which are not appropriate.

21         Have you talked to him, Mr. Siegel, at all about

22    bringing common sense and reason to him as a client of yours?

23         MR. SIEGEL:  Your Honor, without obviously divulging

24    attorney-client communications, the defendant and I have had

25    many, many conversations about how the matter should proceed.

7B8SOZSUSAMLAR

1   But I think the defendant feels that it should be proceeding in

2   a particular manner.  He has prepared a written statement to

3   the court which he is reading right now and the defendant is

4   the captain of his ship.

5          THE COURT:  He is his own lawyer.

6          MR. SIEGEL:  If the court wishes to view that ship as

7   the Titanic, that is something else, but the defendant is

8   prepared and he has written a statement and he has certain

9   positions about the conduct of the prosecution and the agents

10  involved in this case.

11         THE COURT:  Well, the lawyer representing as standby

12  counsel his son raised the issue that he has never in his

13  considerable experience as a criminal defense lawyer had a

14  client that hurt himself more post conviction by his conduct

15  than his son did.

16         I hate to see the same thing happening with his father

17  but he doesn't seem to listen to anyone and he has his own mind

18  of how he wants to handle things and there are things that

19  should be raised and there are things that are extraneous and

20  are not appropriate at the time of his sentence.  He has the

21  chance to appeal with respect to the matters that have happened

22  and my rulings in connection with them, but we have to move

23  ahead.  We have reached the point where unless the government

24  tells me they are matters that are concerning the government

25  and that are matters that I should take into consideration, we

7B8SOZSUSAMLAR

1    have to move ahead.

2            What does the government say?

3            MS. ROCAH:  Your Honor, the government has no reason

4    whatsoever to delay the sentencing.

5            THE COURT:  All right.  If he has a statement that he

6    has prepared he might want to hand it in as an exhibit and it

7    will be part of the record on appeal.  Otherwise he can read it

8    if he wishes to.

9            Why don't you talk to him, Mr. Siegel, as to the best

10   way to proceed now.  He seems to be bringing up matters that

11   shouldn't be considered at the time of the sentencing but he

12   has done this before, and he is doing it again.

13           Why don't you talk to him and see how you recommend he

14   proceed.

15           MR. SIEGEL:  Your Honor, I know he has prepared a

16   statement.  The statement is not in English.  It's in Turkish.

17   I don't think it's all that lengthy.  I think he has read most

18   of it.  I would suggest we just proceed.

19           THE COURT:  All right, why don't we proceed.

20           THE DEFENDANT:  I would like to remind only one thing

21   to your Honor.  The witness named Mabrouk, who is a cooperating

22   witness, and the case agent Campanella and the prosecutor, Ms.

23   Rocah, and in my case with Judge Wood the case agent is

24   Campanella and the prosecutors are Southwell and Rocah.

25           That is it, thank you.

7B8SOZSUSAMLAR

1          THE INTERPRETER:  I think he wanted to point out that

2    the both people were involved in both cases.

3          THE DEFENDANT:  Thank you very much.

4          THE COURT:  He has completed his comments.

5          Does the government want to add anything more based on

6    what he said?

7          MS. ROCAH:  I wanted to address a couple of things

8    raised by Mr. Siegel and the defendant just for clarity of the

9    record.  I will be very brief.  First of all -- not raised by

10   Mr. Siegel but raised by the defendant in his last letter which

11   the government did not respond to in writing.  One of claims

12   was that there was substantial assistance on his part to the

13   government.  I just want to say for the record that there was

14   absolutely no substantial assistance by the defendant.  The

15   government has never credited any information that this

16   defendant has attempted at times to send in incoherent letters

17   to the government.  They have never acted on it.  They have

18   never used it.  There is just no substantial assistance

19   whatsoever that has led to any FBI or other agency cases.

20         Most of these issues we have been over again and again

21   and as your has pointed out, the defendant will have a chance

22   to appeal and the record will speak for itself.  This issue

23   about the tampering with the CD and the sealing of the

24   envelope, the FBI envelope in which the CD was contained which

25   marks each time that the CD was taken in and out of evidence

7B8SOZSUSAMLAR

1    for proffer purposes, for what purpose it was taken in and out,

2    is in evidence as a Government exhibit.  The government

3    produced a copy of that to the defendant as he requested.  It

4    wasn't the first time he has seen it as he is claiming now

5    because it was also available at trial.  The dates on that will

6    speak for itself.  The defendant's claims about there being a

7    lapse in time are just frivolous.  And I hate to even credit

8    them with any response but I am just trying to give a little

9    bit of clarity to the record for the appeal.

10          The issue about the concurrent versus consecutive

11   time, I believe Mr. Siegel is correct that it's mandatory but

12   under the guidelines it's mandatory that it be consecutive and

13   obviously the guidelines are advisory.  The government would

14   request, however, that guidelines or no guidelines that this

15   court impose a consecutive sentence because this crime, which

16   is obviously extremely serious in nature, was completely

17   separate from the first case which he was tried before Judge

18   Wood, which was a fraud identity theft, a large one, in which,

19   by the way, I was not involved in.  I was not a prosecutor in

20   the case.  That was only Mr. Southwell.  But, in any event, the

21   defendant clearly should be punished separately for those two

22   cases because one has absolutely nothing to do with the other

23   and it makes the crime that he committed here substantially

24   more serious that he was able to commit it and attempt to

25   commit such a serious crime from prison while facing trial

7B8SOZSUSAMLAR

1    before another judge in this courthouse.

2            I guess the last thing that I just wanted to address,

3    and we can talk about this after your Honor imposes sentence,

4    but the request that the defendant be imprisoned with his son

5    and his request that he be held here for a certain amount of

6    time and all of his various demands about that, obviously as

7    your Honor pointed out the court can make recommendations.  The

8    government doesn't usually take a position on such things,

9    although I will say in this case I think that the Bureau of

10   Prisons already is aware and will be made further aware that

11   the very nature of this crime here had to do with the son and

12   the father conspiring together and that the government's belief

13   is when the two of them are together they present a much

14   greater danger to society, not to mention to FBI agents and

15   prosecutors who are responsible for them being in jail.  And so

16   while we normally don't take a position I think here we would

17   recommend to the Bureau of Prisons that they be separated and

18   my understanding is that the Bureau of Prisons will be doing

19   that based on the nature of the crime here.

20           THE COURT:  How about him getting yet another lawyer

21   appointed which he is requesting as appellate counsel who would

22   have to familiarize herself with the entire record at taxpayer

23   expense?

24           MS. ROCAH:  Your Honor, it seems indulgent in a way

25   that the government obviously would not recommend.  However, I

7B8SOZSUSAMLAR

1  hesitate to take a position only because I believe Mr. Siegel

2  is actually going to be making a motion to have himself removed

3  and so I will let Mr. Siegel and the court speak to that.  We

4  do think it's a bit wasteful at this point.

5          THE COURT:  I would be remiss if I didn't express my

6  appreciation to the standby counsel for both the father and son

7  and the diligent way they went about their work and tried to be

8  of assistance to their clients.  Mr. Siegel is to be

9  complimented for the time and effort that he has put into

10  representing Mustafa even though, as he rightly said,

11  attorney-client privilege is such that he should not be asked

12  to comment on his representation and his conversations.  But I

13  do want to commend him for what I have noticed here in court of

14  his patience and his wanting to help his client, as was true in

15  Mustafa's son's case too.  So it's a credit to the CJA panel

16  that lawyers of your quality are available and make the efforts

17  you do.  I am very impressed by the way you went about, Mr.

18  Siegel, your representation of Mustafa.  But I will hear from

19  you.

20          MR. SIEGEL:  Thank you very much.  I appreciate those

21  comments, your Honor, truly I do, as a member of the bar and as

22  an individual.

23          While Ms. Rocah was speaking, the defendant handed me

24  Government Exhibit 25 and he likely wants to make mention of

25  page 3 of that exhibit.  Apparently there is a comment, and

7B8SOZSUSAMLAR

1    again I am just reflecting what he wants on the record, but

2    apparently there were conversations mentioned on page 3 of that

3    document where there appear to be people speaking Arabic and I

4    believe the conversations here were in Turkish, which is an

5    entirely different language than Arabic.

6            In addition, your Honor, based upon my representation

7    of the defendant all along, I am going to make an application

8    to be relieved at this point after the notice of appeal is

9    filed and I think Ms. Fink might be willing to take over the

10   case.  I think based upon my representation of Mr. Ozsusamlar

11   and his feelings about having new counsel, I think it's

12   probably in everybody's best interest that after this

13   proceeding that the court allow me to be relieved as counsel.

14           THE COURT:  All right.  I will take that under

15   advisement but the government isn't opposing your application,

16   as I understand it.

17           MS. ROCAH:  That is correct, your Honor.

18           THE COURT:  And we don't know at this point whether

19   Ms. Fink has been contacted and has indicated a willingness to

20   proceed.

21           Does the government know?

22           MS. ROCAH:  I have no idea, your Honor.  I hadn't

23   heard about that until today.

24           MR. SIEGEL:  Just bear with me, your Honor.

25           (Pause)

7B8SOZSUSAMLAR

1          MR. SIEGEL:  I don't think the defendant has spoken to

2     Ms. Fink, your Honor.

3          THE COURT:  I think it's appropriate, Mr. Siegel,

4     based on all of your time and effort and conscientious work on

5     behalf of your client, that the court grant your application as

6     soon as new counsel is appointed.

7          Would this be standby counsel or appellate counsel?

8     You might talk to your client to find out the role of the

9     replaced counsel.

10          MR. SIEGEL:  I think he indicated this would be

11     appellate counsel, your Honor.

12          THE COURT:  All right.  So that we will move ahead

13     with that consideration, but you will remain as counsel until

14     we do have a person in place --

15          MR. SIEGEL:  Yes, your Honor.

16          THE COURT:  -- representing Mustafa.

17          I think at this point, as time has gone by, I hoped

18     maybe to give the sentence, which isn't going to be that long.

19     We only have about an hour more but I think probably with the

20     time being what it is, we all should proceed after lunch

21     because otherwise I may not be through by 1 o'clock at this

22     point.

23          Are counsel available if we take our lunch recess now

24     and complete the matter within about an hour?

25          MR. SIEGEL:  Yes, your Honor, that is fine with me.

7B8SOZSUSAMLAR

1          THE COURT:  How about government counsel?

2          MS. ROCAH:  Your Honor, I have some things scheduled

3     this afternoon.  I can try to move them.  I didn't know we were

4     coming back after lunch.

5          THE COURT:  I will go ahead.  Why don't I see how we

6     go.  There isn't that much left.

7          I am not going to request that counsel stand with his

8     client during this period as we do sometimes because I think

9     it's good for you both to be seated and, Mr. Mustafa, feel free

10    to talk to your lawyer as we proceed to the extent you want to

11    get advice.

12         Subdivision V.  Determination of defendant's sentence.

13         Subdivision A.  Calculation of the guideline range.

14         I will now discuss the court's determination of

15    defendant's sentence.  First, I will explain the calculation of

16    the guidelines range.

17         Probation found that defendant's criminal history

18    category is IV and total offense level is 33.  Under the plain

19    language of Section 3D1.2 of the guidelines, however, 32 is the

20    appropriate total offense level.  Though defendant did not

21    raise this point in his sentencing memoranda, the court will

22    apply the same reduction in offense level to Mustafa as it

23    applied to his co-defendant, Osman Ozsusamlar.  The relevant

24    guidelines provision states that counts involving

25    "substantially the same harm shall be grouped together into a

7B8SOZSUSAMLAR

1   single group."   U.S.S.G. Section 3D1.2.   In defining the

2   phrase "substantially the same harm," the guidelines specify

3   that" counts involve substantially the same harm within the

4   meaning of Section 3D1.2 (a) when counts involve the same

5   victim and the same act or transaction."   (U.S.S.G. Section

6   3D1.2.)   There is no question here that all three counts

7   involved the same victim and the same act or transaction.   As I

8   stated earlier, in categorizing Count 3 -- conspiracy to commit

9   extortion in violation of 18 U.S.C. 951 -- as a separate group,

10  probation recommended various enhancements.   Because the three

11  counts in this case should be grouped together as one, a

12  detailed analysis of these recommended enhancements is

13  unnecessary.   Thus, the appropriate total offense level is 32.

14          The guidelines provision for a total offense level of

15  32 and a criminal history category of IV is a term of 168-210

16  months imprisonment.

17          Defendant asks the court to consider a departure under

18  section 5K.1 of the guidelines, which allows for a departure

19  "upon motion of the government stating that the defendant has

20  provided substantial assistance in the investigation or

21  prosecution of another person who has committed an offense  . .

22  . . " U.S.S.G. Section 5K1.1.  The government has made no such

23  motion here.  Further, while Mustafa states that he gave

24  information to prosecutors in 2001, he fails to provide any

25  detail relating to such assistance.  The court therefore has no

7B8SOZSUSAMLAR

1    reason to depart from the applicable guidelines range.

2              B.  Consideration of Section 3553(a) factors.

3              As I am obligated to do following Booker and Crosby, I

4    turn now to consideration of the Section 3553(a) factors.  As I

5    stated earlier, Mustafa asks the court to sentence him "to a

6    term that reflects that no one was actually threatened, harmed

7    or injured."  (Defendant's 10/9 memo at 4.)  Mustafa

8    additionally informs the court of a few acts of community

9    service.  (Defendant's 10/ 19 memo at 5.)  These points

10   implicate Section 3553(a)(1), which obligates the court to

11   consider the "nature and circumstances of the offense and the

12   history and characteristics of the defendant," and Section

13   3553(a)(2(A), which requires that the sentence imposed reflects

14   the seriousness of the offense.  The facts relevant under

15   Section 3553(a) do not weigh in favor of imposing a

16   non-guideline sentence.  Mustafa's criminal history

17   demonstrates that he is unlikely to abide by the law and that

18   he poses a significant threat to the public.  Here, Mustafa

19   orchestrated a scheme from prison, using his son Osman, to have

20   a man and his wife killed over a debt of less than $300,000.

21   Despite the fact that no one was ultimately harmed, this

22   certainly is a serious offense, and points to Mustafa's

23   continued inability to abide by the law.

24              C.  Other considerations.

25              Mustafa also asks for this court's sentence to run

7B8SOZSUSAMLAR

concurrently to the sentence imposed by Chief Judge Wood in

United States v. Ozoglu et al., 02 Cr. 763.  Mustafa's

conviction in the instant matter is for conspiracy to commit a

murder for hire, murder for hire, and conspiracy to commit

extortion, all of which occurred while he was serving a term of

imprisonment for another offense.  Under such circumstances,

the guidelines provide that "the sentence for the instant

offense shall be imposed to run consecutively to the

undischarged term of imprisonment."   U.S.S.G. Section 5G1.3A.

However, 18 U.S.C. Section 3584 gives the court some discretion

to impose a concurrent sentence after weighing the factors

listed in 18 U.S.C. Section 3553(a).  See United States v.

Perez, 328 F.3d 96, 97 (2d Cir. 2003) ("the courts of appeals

that have considered the matter now agree that U.S.S.G. Section

5G1.3A and 18 U.S.C. Section 3584 are not in conflict, and that

the consecutive sentence mandate of Section 5G1.3A precludes

concurrent sentencing except insofar as the sentencing judge

identifies grounds for a downward departure.").  As I

previously discussed, the Section 3553(a) factors present in

this case do not weigh in defendant's favor.  Thus, today's

sentence will run consecutively to the sentence imposed by

Chief Judge Wood.

      D.  Imposition of a reasonable sentence.

      Under Second Circuit precedent, the final step in the

post Booker/Crosby sentencing environment is the imposition of

7B8SOZSUSAMLAR

1  a reasonable sentence.  Fernandez, 443 F.3d at 26.  Under this

2  consideration, a court reviewing whether a sentence is

3  reasonable does so not only by looking at the sentence itself,

4  "but also at the procedures employed in arriving at the

5  sentence."  Id. at 26 (citing United States v. Crosby, 397

6  F.3d 103, 114 (2d Cir. 2005) (Newman, J.); see also United

7  States v. Selioutsky, 409 F.3d 114, 118 (2d Cir. 2005).  The

8  review of a sentence for reasonableness is "akin to review for

9  abuse of discretion."  Fernandez, 443 F.3d at 27.  Therefore,

10  a sentence will be unreasonable only where the judge imposing

11  it has "exceeded the bounds of allowable discretion,  . . .

12  committed an error of law in the course of exercising

13  discretion, or made a clearly erroneous finding of fact."  Id.

14  (citing Crosby, 397 F.3d at 114).

15         Further, the Fernandez court "declined to establish a

16  presumption, rebuttable or otherwise, that a guidelines

17  sentence is reasonable."  Id.  However, it did hold that in

18  the "overwhelming majority of cases" a guidelines sentence will

19  fall well within the range of sentences that will be considered

20  reasonable.  Given that no mitigating factors apply to Mustafa,

21  imposing a sentence below the guideline range would be

22  unreasonable as "exceeding the bounds of allowable discretion."

23         Based on the considerations that I have already

24  stated, the court finds that Mustafa's criminal history

25  category is IV and his offense level is 32.  This corresponds

7B8SOZSUSAMLAR

1    to an advisory sentence range of 168-210 months.

2            Based on the written submissions as well as

3    consideration of the parties' statements today, the court

4    hereby sentences the defendant to 188 months in prison,

5    consisting of the statutory maximum 120 months for Counts 1 and

6    2, to run concurrently, and 68 months for Count 3, to run

7    consecutively.  The total punishment of 188 months imprisonment

8    is to be followed by 3 years of supervised release.  This

9    sentence is to run consecutively to the 235-month sentence

10   imposed by Chief Judge Kimba Wood in United States v. Ozoglu et

11   al., 02 Cr. 763.

12           The court accepts probation's recommendation that

13   defendant's fine be waived because he is subject to a $20,000

14   fine imposed by Chief Judge Wood.  The defendant is ordered to

15   pay an immediate special assessment of $300 ($100 per count) to

16   the United States pursuant to 18 U.S.C. Section 3013.  The

17   court accepts all other mandatory conditions of incarceration

18   recommended by probation in the PSR.

19           It's probably useful if I actually read those

20   mandatory conditions and the standard conditions from pages 21

21   to 22 of the PSR.

22           Mandatory conditions:  If a period of

23   probation/supervised release is ordered, the following

24   conditions are mandatory:  The defendant shall not commit

25   another federal, state or local crime.  The defendant shall not

7B8SOZSUSAMLAR

1   illegally possess a controlled substance.  The defendant shall

2   not possess a firearm or destructive device.

3          The mandatory drug testing condition is suspended

4   based on the court's determination that the defendant poses a

5   low risk of future substance abuse.

6          The defendant shall cooperate in the collection of DNA

7   as directed by the probation officer.

8          Standard and special conditions.

9          The standard conditions of supervision 1-13 will apply

10  in this case with the following special conditions:

11         1.  The defendant shall obey the immigration laws and

12  comply with the directives of immigration authorities.

13         The defendant is to report to the nearest probation

14  office within 72 hours of release from custody.  If the

15  defendant is sentenced to any period of supervision, it is

16  recommended that the defendant be supervised by the district of

17  residence.

18         Now, the requests made during these proceedings, other

19  than what I have already covered, I will indicate for the

20  Bureau of Prisons to consider having the defendant incarcerated

21  as close to New York City as possible.

22         I do not recommend that he be incarcerated in the same

23  facility as his son for the reasons stated here by the

24  government today.  Efforts will be made to obtain appellate

25  counsel to represent the defendant on appeal, and to be

7B8SOZSUSAMLAR

1   appointed as appellate counsel.

2           I will ask Mr. Siegel to be sure that the time does

3   not run from filing a notice of appeal while he still is

4   representing him since we don't know how long it will take for

5   him to have appellate counsel in place.

6           I will leave it up to appellate counsel whether or not

7   a request will be made to have a detective assigned in

8   connection with considerations of the appeal and the government

9   may or may not oppose that application depending on the reasons

10  given.

11          Anything else that the government would want me to add

12  to that?

13          MS. ROCAH:  No, your Honor.

14          This is implicit in what you said, but the defendant

15  obviously needs to be advised of his right to appeal also.

16          THE COURT:  Yes.

17          MR. SIEGEL:  Your Honor, I know that when the

18  defendant said he wanted a detective appointed, I think

19  probably the appropriate translation would be investigator as

20  opposed to a detective.

21          THE COURT:  All right.

22          MR. SIEGEL:  What I will do is once we conclude this

23  session today, I will immediately go down and file a notice of

24  appeal on his behalf.

25          The only thing is while the court was reading the

1    decision in and knowing what the sentence would be, I inquired

2    of the defendant whether he wished -- and I know sometimes this

3    can be arranged -- whether he wanted to serve his sentence here

4    or in Turkey and he indicated that he wished to serve his

5    sentence here in the United States as opposed to serve the

6    sentence in Turkey, and I guess having seen the old movie

7    Midnight Express I can appreciate why he would want to serve it

8    in this country as opposed to Turkey.

9              THE COURT:  Well, that issue isn't before the court.

10             MR. SIEGEL:  I understand, your Honor.  But I just

11   wanted to raise this.  I did advise or find out whether he

12   wanted that recommendation to be made and he does not want it

13   to be made.

14             THE COURT:  Does the government think that should be

15   included?

16             MS. ROCAH:  No.

17             THE COURT:  I don't think it's an issue.

18             MR. SIEGEL:  Okay.

19             Your Honor, just before the court --

20             THE COURT:  But needless to say if I am wrong on that

21   and unexpectedly the Bureau of Prisons indicates that he should

22   be serving his sentence in Turkey, there should be an

23   application made to me in that regard and I will consider what

24   you are saying here today at that point.

25             MR. SIEGEL:  As I said, the defendant said he does not

7B8SOZSUSAMLAR

1    wish to serve his sentence in Turkey.

2            Just one other thing before the the sentence is

3    imposed.  I would like to point out that if the court does in

4    fact impose a consecutive sentence upon the defendant,

5    according to my preliminary calculations, he probably will be

6    approximately 95 years old before he would be released and,

7    again, I would ask the court to reconsider whether based

8    upon -- it would effectively become a life sentence for the

9    defendant, and whether the court would reconsider and impose

10   your sentence as a concurrent as opposed to a consecutive

11   sentence.

12           THE COURT:  I have fully considered the amount of time

13   involved, the seriousness of the offenses, and all the other

14   factors and the sentence I imposed was having those

15   considerations in mind, so I need not reconsider.  I did impose

16   the sentence with those considerations in mind.

17           Anything else the government wished me to consider?

18           MS. ROCAH:  No, not to consider, your Honor.

19           MR. SIEGEL:  If the court would bear with me for one

20   moment, your Honor.

21           (Pause)

22           THE COURT:  I think formally I should advise the

23   defendant, as the government suggested, that you have a right

24   to appeal and I understand your standby counsel is going to

25   actually file a notice of appeal.  But the government is

7B8SOZSUSAMLAR

1    correct in requesting that I actually advise you of your right

2    to appeal since if a notice of appeal is not filed, you will

3    waive that right.

4            MR. SIEGEL:  If the court will bear with me for one

5    moment, I think the defendant would like to tell me something.

6            (Pause)

7            MR. SIEGEL:  Your Honor, the defendant has a technical

8    question and the defendant would like to know when for

9    computation purposes, when does your sentence begin to run?

10   Does it run from when the crime occurred, which was sometime in

11   October, September-October 2005, or does it run or commence

12   from a later time?

13           THE COURT:  It may well be that as soon as he was

14   arrested and he was in custody the time started to run.  Maybe

15   the government can tell us.

16           MS. ROCAH:  Obviously this is a calculation that the

17   Bureau of Prisons will do and I suppose if the defendant has

18   objections to their calculations he can raise it then since

19   sitting here now we don't know what it will be.  It's something

20   done by the Bureau of Prisons.  But my understanding is he was

21   in custody on the previous conviction and so I am not sure if

22   he would have received credit yet on this sentence but I don't

23   really want to speculate because it's a Bureau of Prison's

24   calculation.

25           Your Honor, I am sorry, I would hate for there to be

7B8SOZSUSAMLAR

1    any technicalities.  I believe the defendant should also be

2    advised that as to his right to appeal, he has to do it within

3    ten days from the entry of judgment.

4              THE COURT:  That is correct.

5              MS. ROCAH:  I know his lawyer indicated he is going to

6    file it today so it's not an issue.

7              THE COURT:  It's correct that such a statement is

8    appropriate to be made and I make it.  It has to be within ten

9    days of when judgment is filed by this court.  There is that

10   time limitation.

11             There are so many matters that have been raised, I

12   want to be sure I cover them all.  To make it clear, he

13   continues to raise issues about tampering, which seems to be an

14   endless process on his part.  I have already ruled with respect

15   to these considerations.

16             To the extent he is adding or embellishing on those

17   considerations it's my same ruling with respect to it not being

18   a matter to be considered at sentencing and he does have the

19   right to appeal with respect to all my rulings.  And to the

20   extent I haven't specifically denied any of his other requests

21   here, I do deny them to the extent I haven't already done it.

22             Anything else?

23             MS. ROCAH:  No, your Honor, not from the government.

24             MR. SIEGEL:  No, your Honor.

25             THE COURT:  Thank you for your patience.

7B8SOZSUSAMLAR

1           MS. ROCAH:  Thank you, your Honor.

2           MR. SIEGEL:  Thank you, your Honor.

3

4

5                              - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25